UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

———————————————————————
                                                          )
SECURITIES AND EXCHANGE COMMISSION,    )
                              Plaintiff,                  )
                                                          )
              v.                                          )          Case No. 14-14692-LTS
                                                          )
HOWARD B. PRESENT,                                        )
                              Defendant.                  )
———————————————————————   )

**MEMORANDUM IN SUPPORT OF
DEFENDANT'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND
DISCLOSURE OF COMMUNICATIONS BY MORTON WEALTH ADVISORS,
DAVID JAY MORTON, AND MICHAEL CAPOBIANCO,
AND TO COMPEL PRODUCTION BY MORTON'S EMAIL VENDORS**

Defendant Howard B. Present has moved to compel the production of documents and

disclosure of communications by non-parties Morton Wealth Advisors ("Morton Wealth" or

"Morton Financial"), David Jay Morton ("Mr. Morton"), and Michael Capobianco (collectively,

"Morton"), and to compel production by Morton Wealth email vendors mindSHIFT

Technologies, Inc. ("mindSHIFT"), Sonian Inc. ("Sonian"), and Elysium Digital, LLC

("Elysium").

For over two years, Morton has repeatedly made material misrepresentations, first to the

SEC and then to Defendant's counsel, regarding missing Morton Wealth emails from the 2008-

2009 timeframe crucial in this litigation.  Morton has repeatedly blamed mindSHIFT for losing

the emails.  Following Defendant's extensive discovery efforts, however, mindSHIFT has

reiterated what the record confirms mindSHIFT explained to Morton all along: if Morton's

emails are missing, it is Morton that "lost" them.

Given that this litigation is focused substantially on what Morton told Mr. Present in mid-2008, as well as on Mr. Morton's and Mr. Present's respective credibility on that topic, the reason that Morton's emails are missing, and the contents of such emails, are crucial and appropriate subjects of discovery.  Obtaining that discovery, however, has been hindered and delayed by Morton's continued obfuscations regarding its missing emails, as well as assertions of privilege and confidentiality that are now demonstrably improper, which have required substantial investigation by Defendant.

Accordingly, Defendant requests that the Court order that (1) pursuant to the crime-fraud exception, Morton produce to Defendant all purportedly attorney-client privileged documents, and disclose all purportedly attorney-client privileged and/or confidential communications, concerning Morton Wealth's purportedly missing emails; and (2) mindSHIFT, Sonian, and Elysium produce directly to Defendant (a) any Morton Wealth emails from 2008 through August 2009 previously described by Morton as missing, (b) any Morton Wealth documents that are identifiably responsive to a prior subpoena to Morton in connection with this matter, and (c) any communications with Morton or Morton's counsel, and any other documents, regarding either 2(a) or 2(b).

**<u>Background</u>**

<u>F-Squared & Morton</u>

Defendant served as the Chief Executive Officer of F-Squared Investment Management, LLC ("F-Squared"), from 2006 to 2014.  Answer ¶ 1 (ECF No. 14).  F-Squared's core business model was creating and marketing indexes—primarily to investment advisers or mutual funds.

*See id.*[1]  F-Squared's clients licensed the indexes, then constructed funds or other investment vehicles in which their own customers could invest, that tracked those indexes.

In early 2008, Mr. Present began discussions with Mr. Morton, principal of Morton Wealth, regarding selling to Morton Wealth several of F-Squared's existing AlphaCycle indexes. Eventually, these discussions involved Morton Wealth's ETF sector rotation investment strategy, which Mr. Morton represented his company had been using to manage client assets.[2]  As a result of these discussions, Mr. Morton participated in creating a new entity, Newfound Research, to license the ETF sector rotation strategy to F-Squared.  The license included rights to historical buy/sell signals as well as to future buy/sell signals from an improved algorithm, programmed by Corey Hoffstein (who became a principal of Newfound), which generated the quantitative buy/sell signals used in the strategy.  F-Squared translated the strategy into F-Squared's AlphaSector Rotation Index ("AlphaSector"), which was launched in October 2008.

During mid-2008, Mr. Morton had told Mr. Present that he had been managing money using the strategy since 2001, and Morton Wealth or its agent provided F-Squared with buy/sell signals for that historical timeframe, which F-Squared incorporated into the AlphaSector index. Mr. Present also learned from Mr. Morton that approximately $100 million of client assets at Morton Wealth were tied to the use of the strategy, and that Morton Wealth managed or advised

---

[1] An index is not itself an investable product, but rather a hypothetical benchmark that investment vehicles such as mutual funds can "track" to achieve similar performance.

[2] An ETF or "exchange traded fund" is a fund that, unlike a mutual fund, can be traded on an exchange (comparable to an individual stock).  Morton Wealth's sector rotation strategy used quantitative, momentum-based buy/sell signals to rotate in or out of 9 ETFs related to different economic sectors, and used cash as a residual—the strategy would "go to cash" when the quantitative signals indicated not to hold ETFs, to protect investors from market downturns.

on nearly $4 billion in assets.[3]  F-Squared included this information in its AlphaSector marketing materials.

On December 22, 2014, the SEC brought this action against Mr. Present alleging, *inter alia*, that F-Squared had made false representation about the pre-2008 history of AlphaSector.

<u>SEC Investigation & Morton Wealth's Missing Emails</u>

During the SEC investigation that preceded this litigation, the SEC issued a subpoena request to Morton Wealth for "All communications with or concerning F-Squared, Present, Newfound, … AlphaSector Strategies, or AlphaSector Indexes …."  *See* Ex. 1 (Subpoena Request No. 2 (Oct. 2, 2013)).  In response to this and other SEC subpoena requests, Morton Wealth produced approximately 40,000 pages of documents.

The SEC soon discovered massive gaps in Morton Wealth's email production.  For 2008-2009, productions from other sources included correspondence with Mr. Morton and Mr. Capobianco that show a substantial volume of emails that should have been produced by Morton for that timeframe.[4]  Morton Wealth also produced no emails sent or received during 2008 by Morton Wealth employee Jason Nicastro, who was also involved in the development of AlphaSector and was a key communicator with F-Squared in 2008.

---

[3]  Mr. Morton denies making these representations.

[4] For example, for July 2008 through September 2008, perhaps the most crucial time period for relevant communications in this case, F-Squared produced (1) 139 emails from F-Squared addresses to Morton addresses, and (2) 48 emails from Morton addresses to F-Squared addresses. In contrast, for the same time period, Morton produced only (1) 42 emails from F-Squared addresses to Morton addresses, and (2) zero emails from Morton addresses to F-Squared addresses.

The SEC asked Morton to "provide a summary of the gaps in the email record and the vendor's explanation for the existence of those gaps."  *See* Ex. 2 (Hershman email to Donahue, Apr. 11, 2014 (referencing SEC's request "during our call last week")).  Morton's counsel replied that the emails had been "lost by the vendor":

> The vendor did not have a definitive answer on how the gaps came into existence.  The vendor provided a document indicating that Morton didn't purchase the vendor's archiving service until August 2009.  That fact, however, would not appear to full explain the presence on the vendor's servers of some emails from 2008, but not others…. *[T]he vendor did not have an explanation as to why the emails Jay Morton and Mike Capobianco received in 2008 were on its servers, but the emails Jason Nicastro received in 2008 were not.  The vendor also allowed for the possibility that the data may have simply been lost.  We know that the vendor has gone through two acquisitions or mergers in the last five years, which may have involved transferring data and/or combining systems.  It may be that data was lost during those transitions.*  However, we are unable to determine any more conclusively why certain of the documents sought were not present on the vendor's servers.

*See id.* (emphasis added).  Apparently, the SEC relied upon Morton's explanation blaming the vendor, because there is no record from the investigation that the SEC did anything further regarding the missing emails.[5]

---

[5]  Notably, Mr. Hoffstein had also purportedly lost all of his 2008 emails.  In response to SEC investigative subpoenas and in testimony, Mr. Hoffstein stated that he could not produce those emails because he had suffered a "catastrophic failure" of his hard drive, and that his email vendor (Network Solutions) had been unable, in response to his request, to recover the emails.  *See* Ex. 17 (Hoffstein Depo. at 28-32); *see also* Ex. 18 (Martin letter to Baker, Oct. 31, 2013) (attorney for NFR and Hoffstein informing SEC that "Newfound's document collection will not include emails to or from 'corey@hoffstein.com' … for the year 2008….  Newfound is not aware of any other way of collecting 'corey@hoffstein.com' emails for the period prior to 2009").  As with Morton's missing emails, apparently the SEC did not pursue the issue further.

In this litigation, Defendant issued a subpoena to Network Solutions, which immediately responded that it, in fact, had 163 emails from 2008 in Mr. Hoffstein's account.  Defendant's counsel informed counsel for Mr. Hoffstein, who then produced 131 pages of previously

<u>This Litigation</u>

In a letter dated December 15, 2015, counsel for Mr. Present also inquired of Morton's counsel regarding the 2008 missing emails.  *See* Ex. 3 (O'Brien letter to Hershman, Dec. 15, 2015).  Morton's counsel responded, "In connection with the SEC document production, our clients discovered that *the email vendor appears to have lost some of the data* respecting Morton Wealth Advisors' emails."  *See* Ex. 4 (Hershman letter to O'Brien, Jan. 8, 2016) (emphasis added).  By letter and email on January 11, 2016, Defendant's counsel asked Morton's counsel to identify the relevant vendor.  *See* Ex. 5 (O'Brien letter & email to Hershman, Jan. 11, 2016).  Morton's counsel never responded.

On January 21, 2016, Defendant took a Rule 30(b)(6) deposition of Morton Wealth designee Mr. Capobianco specifically concerning Morton Wealth's document retention and responses to the SEC's and Present's document subpoenas.  *See* Ex. 6 (Deposition Subpoena).  Mr. Capobianco identified the relevant email vendor as mindSHIFT.  *See* Ex. 7 (Morton 30(b)(6) Depo., at 23 (Jan. 21, 2016)).  Mr. Capobianco, however, could not recall any specifics about mindSHIFT and the missing emails:

> Q. I'm sorry, 203, on the second page states, in the first full paragraph, "In short, the reason that the four e-mails identified above were not produced to the SEC is because they were not in the possession, custody, or control of our clients at the time of the document production to the SEC and they are not now.  In connection with the SEC document production our clients discovered that the e-mail vendor appears to have lost some of the data respecting Morton Wealth Advisors' e-mails." Do you see that?
>
> A. I do.

---

unproduced emails that were responsive to subpoena requests from the SEC and/or Defendant. *See* Ex. 19 (Dulberg letter to O'Brien, Mar. 4, 2016)).

Q. Did I read that correctly?

A. I believe so.

MR. HERSCHMAN: Well, I will just add that you didn't read the entirety of the paragraph. The next sentence reads, "Thus, as we previously explained to the SEC, certain documents, including those you referenced above, were not present on the servers of the e-mail vendor used by Morton Wealth Advisors." That is the end of the paragraph.

Q. Mr. Capobianco, are you familiar with the loss of e-mails that's referred to in this paragraph?

A. I am familiar with the fact there was a problem with the e-mail provider, correct.

Q. And when did you first learn they had a problem?

A. I do not recall.

Q. Well, tell me what you do recall about when you first learned of it.

A. I can only recall that it was a problem with producing some e-mails.

Q. Do you recall any other specifics about what the problem was?

A. I don't recall.

*Id.* at 36-38.  Morton Wealth's counsel, however, again blamed mindSHIFT for the missing

emails, and affirmed that the SEC had relied on Morton's assertions of that blame:

> I just want to lodge a continuing objection on further questions about this particular subject, this entire line of questions about some lost data by a third party, not Morton, not the witness. Any insinuation Morton did anything wrong in connection with that we find objectionable and problematic. It obviously has to do with a document production that our clients made to the SEC a couple of years ago and in connection with which, as the witness testified, discussed the issue with the SEC and satisfied the SEC in connection with all of the facts relating to those -- that small amount of data that *the vendor itself somehow managed to lose*.

*Id.* at 55-56 (emphasis added).

7

Morton Wealth also asserted the attorney-client privilege regarding communications

about the missing emails:

> Q. How did you become aware of this problem?

> A. In the scope of this request.

> MR. HERSCHMAN: He's not going to get into any attorney-client privileged communications, and I'm sure you are not inquiring into, so that's why he's telling you that in connection with the gathering of documents in response to the SEC subpoenas, that's when he learned about this issue. He's not going to get into the specifics of the communications with counsel.

*Id.* at 36-38.

Morton Wealth then echoed these privilege assertions in response to document requests.

In a February 1, 2016, subpoena ("Feb. 1 Subpoena"), Defendant requested that Morton produce

"[a]ll Documents and Communications concerning any searches for or attempts to locate,

retrieve, or recover electronic documents or data" in connection with the missing emails. *See* Ex.

8 (Request No. 3). Morton responded that it would produce only "*non-privileged* responsive

documents." *See* Ex. 9 (Resps. & Objs., No. 3 (Feb. 22, 2016)) (emphasis added).[6]

### The Reality

Following correspondence with, a document subpoena to, and the 30(b)(6) deposition of

Morton Wealth (which finally identified mindSHIFT as the Morton Wealth email vendor)

regarding the missing emails, Defendant's counsel sought discovery directly from mindSHIFT.

The results of these efforts are clear: mindSHIFT did not lose the missing emails, and never told

---

[6] Morton produced approximately 28 non-privileged pages in response to this request, consisting of email correspondence between Morton's counsel and mindSHIFT or the SEC.

Morton or Morton's counsel that it had.  On the contrary, mindSHIFT explained to Morton's

counsel that if any Morton Wealth emails were missing, it was Morton that "lost" them.

Defendant served mindSHIFT with two subpoenas.  *See* Ex. 10 (first subpoena); 11

(second subpoena).  In response, mindSHIFT has produced email correspondence regarding the

missing emails, a spreadsheet that lists 1,601 Morton emails from 2008 that mindSHIFT

possesses, as well as an affidavit by Steven Robinson, Chief Legal Officer of mindSHIFT.  *See*

Ex. 12 (Robinson Aff., May 5, 2016).  Mr. Robinson attests that while Morton engaged email

hosting services from mindSHIFT in April, 2008, Morton Wealth did not sign up for email

archiving services until August, 2009.  *Id.* ¶ 16.  Morton Wealth has controlled the archive and

ultimately what emails were included in it or not—including any emails from 2008.  *Id.* ("As

noted above, mindSHIFT's email archiving services are designed to provide end users of that

service or their employers with sole control over the contents of their email archives.").[7]

This is the same information that mindSHIFT provided to Morton's counsel two years

ago, at the time of the SEC's initial inquiry regarding the missing emails.  Morton's counsel

discussed the issue in a call with Mr. Robinson on April 1, 2014.  *See* Ex. 13 (Millette email to

Robinson, Apr. 2, 2014 (referencing "questions that I referenced on our call yesterday")).

---

[7]  *See also id.* ¶ 40 ("mindSHIFT has no knowledge of the disposition of whatever email Morton Financial's end-users sent during 2008.  As noted above, Morton Financial did not engage mindSHIFT to provide email archiving services until late 2009.  mindSHIFT's records indicate that it provided hosted email and email archiving services to Morton Financial as it ordinarily does – that is, in a manner that enabled Morton Financial and its end-users to have sole control over the contents of their hosted email accounts and email archives.").  Morton has not provided any information to suggest that it had arranged for any email archiving service in 2008 or prior to August of 2009, even though email retention is a statutory requirement for all Massachusetts Registered Investment Advisors.

Morton's counsel requested "a summary of any gaps in the Morton emails you have from the

beginning of the relationship to present."  *Id.*  Mr. Robinson responded:

> Morton is in as good a position as mindSHIFT to prepare a summary of the
> perceived gaps in the email record.  As we discussed, it was up to Morton to
> determine whether, when and how to utilize our email archiving service. To the
> extent it chose not to do so, we provided the hosted email service we were
> engaged to provide, the email record is what it is today as a consequence of the
> services that we were and were not engaged to provide, and there are no 'gaps.'

*Id.* (Robinson email to Millette (cc: Hershman), Apr. 2, 2014).

Mr. Robinson affirms that Morton's blaming of mindSHIFT for over two years has been

baseless and certainly contrary to the information that mindSHIFT had provided Morton:

30.    In the course of responding to the [Defendant's] Subpoenae, I learned that
Morton Financial represented to the Defendant and to the Securities and
Exchange Commission that mindSHIFT lost certain email, including email
sent by one or more Morton Financial end-users during 2008.

31.    To my knowledge, that statement has no basis in fact.

32.    Nothing in the service history indicates that any outage, data breach or
other event or circumstance ever occurred that resulted in the loss of any
Morton Financial email.

33.    Upon information and belief, Morton Financial never alerted mindSHIFT
at any time to the effect that mindSHIFT had lost its email or sought
support for any apparent loss of its email.

34.     In the course of the correspondence referred to above, Morton Financial's
counsel asked me to explain why certain email -- notably including email
sent by Jason Nicastro during 2008 -- had not been found.

35.    My explanation at the time was essentially the same as what this Affidavit
states – that is, Morton Financial had sole control at all times over the
contents of its end-users' hosted email account and any email archives
they chose to create.  mindSHIFT provided the host email and email
archiving services it was engaged to provide.  The Morton Financial email
found on our systems as a result of responding to Morton Financial's
request in 2014 is all the Morton Financial email mindSHIFT then had.

36.     The presence or absence of any specific email reflects Morton Financial's actions and those of its end-users to retain or delete that email, nothing more.

37.     My recollection is that counsel for Morton Financial never alleged that mindSHIFT had acted or failed to act in any manner that resulted in the loss of any Morton Financial email, nor is there or was there ever any basis in fact for such an allegation.

38.     Because there are no indications that any such loss of email occurred at any time, neither I nor to my knowledge, any other mindSHIFT employee, ever told Morton Financial or its counsel that mindSHIFT had lost any Morton Financial email.

*See* Ex. 12.  mindSHIFT has informed Defendant that it will not produce any of the 1,601 Morton emails in its possession without Morton's permission or a court order.

<u>Sonian</u>

Defendant's counsel has also asked mindSHIFT's counsel whether mindSHIFT has in its possession, custody, or control emails sent by Mr. Morton or Mr. Capobianco during 2008. mindSHIFT's counsel stated that to the extent such emails exist, they would be in the possession of a mindSHIFT archiving sub-vendor, Sonian.  mindSHIFT's counsel also relayed that Sonian would not confirm the existence of such emails, let alone produce them, without Morton's approval.  *See* Ex. 12, ¶ 43 (Robinson Aff.).  On April 28, 2016, Defendant's counsel issued a subpoena to Sonian requesting the missing 2008 Morton Wealth emails, with a return date of May 6.  *See* Ex. 14 (Subpoena).[8]  Defendant has not yet received Sonian's response.

_____

[8]  The subpoena is dated "3/28/16" but was actually issued to Sonian on April 28, 2016.  *See* O'Brien Decl. ¶ 15.

<u>Elysium</u>

During the 30(b)(6) deposition, Mr. Capobianco stated that he believed Morton Wealth has also involved another vendor in the missing emails, but could not identify that vendor.  *See* Ex. 7, at 44 (30(b)(6) depo.).  In response to the follow-up Feb. 1 Subpoena, *see* Ex. 8, Morton Wealth stated that Morton's counsel had worked with Elysium in connection with efforts to locate, retrieve, or recover the missing emails*, see* Ex. 9, at 6 (Resp. No. 2).  Defendant then issued a subpoena to Elysium.  *See* Ex. 15. (Subpoena, Feb. 23, 2016).  Elysium responded by objecting to each of the subpoena requests, including on grounds that "the documents and testimony sought concern information Elysium is prevented from disclosing without the express written permission of Morton Wealth Advisors."  *See* Ex. 16, at 2 (Brown letter to O'Brien, Mar. 11, 2016).

## **Argument**

**I.**    **Morton's Misrepresentations Bar Any Attorney-Client Privilege Concerning the Missing Emails**

The standard that the First Circuit applies for the crime-fraud exception to the attorney-client privilege is as follows:

> The crime-fraud exception withdraws protection where the client sought or employed legal representation in order to commit or facilitate a crime or fraud. The party invoking the crime-fraud exception must make a prima facie showing: (1) that the client was engaged in (or was planning) criminal or fraudulent activity when the attorney-client communications took place; and (2) that the communications were intended by the client to facilitate or conceal the criminal or fraudulent activity.  By prima facie showing, we mean a reasonable basis to believe that the lawyer's services were used by the client to foster a crime or fraud.  This standard may be met by something less than a mathematical (more likely than not) probability that the client intended to use the attorney in furtherance of a crime or fraud.  However, it requires more than speculation [or] evidence that shows only a distant likelihood of corruption.

*United States v. Gorski*, 807 F.3d 451, 460 (1st Cir. 2015) (internal quotations and citation

omitted); *see also In re Grand Jury Investigation*, 445 F.3d 266, 274-75 (3d Cir. 2006) (burden

of "prima facie showing" … "is not a particularly heavy one").  "If the party asserting the crime-

fraud exception makes this reasonable cause showing (also referred to as a prima facie case), the

privilege is forfeited."  *In re Grand Jury Proceedings*, 802 F.2d 57, 66 (1st Cir. 2015).

Morton's communications, to the SEC and Defendant's counsel, regarding missing

emails plainly satisfy a prima facie showing that the crime-fraud exception applies.  Morton has

repeatedly misrepresented the circumstances related to those emails.  Moreover, these

misrepresentations could not but be intentional: mindSHIFT had explained to Morton that any

fault for the missing emails was Morton's.

Morton's misrepresentations also clearly had an intended material impact.  By blaming

mindSHIFT, Morton evidently convinced the SEC not to pursue further any potential

wrongdoing by Morton in connection with the loss of the emails, including, for example, the

potential violation of books and records regulations as applied to email retention for registered

investment advisors.  *See* 17 C.F.R. § 275.204-2 (books and records requirements for investment

advisers).  Morton also blunted any suspicion of misconduct that might arise because Morton

Wealth was only missing emails from the 2008 timeframe crucial to the allegations in the SEC

investigation and this case.  *See In re Grand Jury Investigation*, 445 F.3d 266 (3d Cir. 2006)

(obstruction of justice in contemporary investigations "frequently take[s] the form of deletion of

past emails").

Communications between Morton and counsel about the missing emails were plainly intended to conceal reality. It was, after all, Morton's counsel who conveyed the misrepresentations to the SEC and Defendant's counsel. *See United States v. Schussel*, 291 Fed. Appx. 336, 2008 WL 3983887, at *8 (1st Cir. 2008) (crime-fraud exception applied where information was provided to attorney "to be used in responses to document requests and other exchanges with the IRS in an effort to deceive the IRS").

Morton has asserted unequivocally that it bore no responsibility for the missing emails. The record now establishes, at a minimum, a prima facie showing otherwise. Morton has accordingly waived any otherwise applicable attorney-client privilege regarding this issue, and should be required to disclose, in documents and testimony, any otherwise privileged communications and materials concerning the issue.

## II. Morton's Email Vendors Should Be Ordered to Produce Any Yet Unproduced and Responsive Emails, as Well as Any Related and Otherwise Confidential and/or Privileged Communications, Directly to Defendant

"District courts exercise broad discretion to manage discovery matters." *Heidelberg Americas, Inc. v. Tokyo Kikai Seisakusho, Ltd.*, 333 F.3d 38, 41 (1st Cir. 2003). Accordingly, this Court should order that mindSHIFT, Sonian, and Elysium produce directly to Defendant (a) any Morton Wealth emails from 2008 through August 2009 previously described by Morton as missing, (b) any Morton Wealth documents that are identifiably responsive to a prior subpoena to Morton in connection with this matter, and (c) any communications with Morton or Morton's counsel, and any other documents, regarding these issues.

Defendant cannot, at this point, rely upon Morton fully to produce responsive documents, much less to do so in a timely manner. Given the discovery schedule in this case, and the time

14

and effort Defendant has expended in reaching this point—including the delay caused by over two years of Morton's misrepresentations—Morton should not be afforded any right to review, preview, or otherwise "filter" documents sought from its vendors.[9]

## Conclusion

Morton's misrepresentations have delayed, frustrated, and misdirected potentially highly relevant discovery in this litigation and the SEC investigation that preceded it.  As the record submitted with Defendant's motion makes clear, Defendant has expended considerable time, effort, and expense to investigate the missing emails—including extensive correspondence with, and multiple subpoenas to, Morton, Morton's counsel, mindSHIFT, Sonian, and Elysium, as well as the 30(b)(6) deposition of Morton Wealth.  The results of have established, at a minimum, a reasonable cause / prima facie showing that the crime-fraud exception applies to the issue of Morton's missing emails.

Accordingly, Defendant asks this Court to issue an order that:

(1)     Morton produce to Defendant all purportedly attorney-client privileged documents, and disclose all purportedly attorney-client privileged communications, concerning Morton Wealth's purportedly missing emails; and

(2)     mindSHIFT, Sonian, and Elysium produce directly to Defendant

---

[9]  In conferring regarding this motion, Morton's counsel did not agree to production of emails by its vendors, as requested in the respective subpoenas.  Morton would agree only that Morton would produce emails located by any of the vendors that are (somehow) identified by Defendant and that Morton determines to be responsive to a subpoena.  Morton also agreed to waive privilege assertions as to Elysium, but only regarding its efforts to locate missing emails (Request Nos. 1a-1c), not regarding anything else as to those emails—including, for example, the reasons they are missing.  *See* Ex. 15 (Elysium Subpoena).

(a) any Morton Wealth emails and attachments from 2008 through August 2009

previously described by Morton as missing (including any emails sent by Mr.

Morton or Mr. Capobianco during 2008, and any emails sent or received by Mr.

Nicastro in 2008),

(b) any communications with Morton or Morton's counsel, and any other

documents, regarding either 2(a) or 2(b).

> Respectfully Submitted,
> HOWARD B. PRESENT,
> By His Attorneys,
>
> */s/ Justin P. O'Brien*
> Michael A. Collora (BBO # 092940)
> Anthony E. Fuller (BBO# 633246)
> Justin P. O'Brien (BBO# 658765)
> Lauren A. Graber (BBO #679226)
> COLLORA LLP
> 100 High Street
> Boston, MA 02110
> (617) 371-1000
> jobrien@collorallp.com

Dated:  May 9, 2016

## CERTIFICATE OF SERVICE

I certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on May 9, 2016.

> */s/ Justin P. O'Brien*