UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:14-cv-14692-LTS |
| | ) |
| HOWARD B. PRESENT, | ) |
| | ) |
| Defendant. | ) |

_____ )

## PLAINTIFF'S MEMORANDUM
## IN SUPPORT OF ITS
## <u>MOTION FOR SUMMARY JUDGMENT</u>

Pursuant to Federal Rule of Civil Procedure 56(a) and Local Rule 56.1, plaintiff

Securities and Exchange Commission ("the Commission") submits this memorandum in support

of its motion for summary judgment against defendant Howard B. Present ("Present").

## <u>INTRODUCTION</u>

Present was the president and CEO of F-Squared Investments LLC ("F-Squared"), an

investment advisory firm in Wellesley, Massachusetts. In mid-2008, F-Squared was a struggling

start-up company that had yet to turn a profit. By 2014, F-Squared was the nation's biggest

money manager building portfolios out of exchange-traded funds. Unfortunately, the story was

too good to be true. When Present began marketing F-Squared's flagship AlphaSector index in

September 2008, he claimed that it was based on an investment strategy developed by a multi-

billion dollar wealth manager, that the strategy had been used to make investments for clients

since April 2001, and that the strategy had consistently outperformed the S&P 500 Index. He

repeated those claims for five years, sometimes adding embellishments such as how the strategy

dropped the financial sector in 2007 and enabled clients to avoid the market downturn after the 9/11 attacks.  Present knew his claims about AlphaSector were false.  He knew the investment strategy F-Squared marketed as AlphaSector was actually based on an algorithm a college intern developed in the summer of 2008.  He knew the intern's algorithm had not been used to make real investments for real people since 2001 and did not have a real 7-year track record.  F-Squared prospered while Present was making those false statements about AlphaSector.  Present prospered too.  His compensation jumped from $114,000 in 2008 to more than $6 million in 2013.  Under Rule 56(a), summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Summary judgment is warranted here, because his own admissions and the undisputed documentary record establish that Present violated several provisions of the Investment Advisers Act of 1940 ("Advisers Act").[1]

## UNDISPUTED FACTS

### Genesis of AlphaSector

Present co-founded F-Squared in May 2006.  [Statement of Facts ("Facts") ¶2.]  At the time, he had eight years of experience as head of product development at two large mutual fund companies, where he supervised teams that helped prepare marketing materials that included the funds' historical performance.  [*Id*. ¶1.]  F-Squared was a registered investment adviser.[2]  [*Id*. ¶3.]  In the summer of 2008, it had one product ("AlphaCycle"), had never made a profit, and had trouble meeting its payroll.  [*Id*. ¶¶4-5.]

---

[1] The Commission's fraud claims against Present also include allegations that he knew or was reckless in not knowing that AlphaSector's reported pre-September 2008 performance was inflated because of a systemic calculation error.  This motion does not address that second theory of liability.

[2] Section 203 of the Advisers Act provides that a registered investment adviser must execute and keep current an application for registration on Form ADV.  *See* 17 C.F.R. §279.1.  F-Squared registered with the Commission in March 2008 by filing a Form ADV.  [Facts ¶3.]

In June and July 2008, Present tried unsuccessfully to market AlphaCycle to Jay Morton, a broker doing business as "Morton Financial". [*Id.* ¶¶13, 15.] Present learned that Morton's firm was developing a quantitative algorithm that could be used in making investment decisions. The algorithm was not an investment strategy. It generated signals based on changes in the price of a security that were designed to dictate buy/sell decisions. [*Id.* ¶¶19, 30.] Present became interested in using this algorithm for a model portfolio of exchange-traded funds (ETFs) that F-Squared could market as an index.[3] [*Id.* ¶16.]

On July 29, 2008, Morton gave Present a data set with the algorithm's signals calculated retrospectively for nine sector ETFs. [*Id.* ¶17.] To evaluate how a portfolio of ETFs using those signals would have performed in the past, Present and Juan Vargas (an analyst at F-Squared) applied certain "portfolio construction rules", such as how often to rebalance the hypothetical portfolio and whether to impose a cap on the holding of any single ETF. [*Id.* ¶¶18-19.] Vargas calculated the performance of a model portfolio of ETFs in several ways using the algorithm's signals. Present knew the different returns that Vargas calculated (which covered the period between December 2000 and May 2008) were "backtested" and did not involve the performance of real investments for real people.[4] [*Id.* ¶¶25-26.] On August 26, 2008, Corey Hoffstein, a college intern working at Morton Financial, gave a presentation to Present and Vargas about the current features of the algorithm, which he was still working on. [*Id.* ¶27.] Present decided that

---

[3] An ETF is a fund usually made up of securities in a particular sector of the economy or tracking a particular index. Unlike a mutual fund, ETF shares trade on an exchange like a stock and experience price changes throughout the day.

An "index" is an imaginary portfolio of securities. An index enables investors to evaluate the collective performance of a sector or another collection of stocks. One well-known index is the Standard & Poor's 500 Index ("S&P 500"), which is an index of 500 stocks chosen for market size, liquidity, and industry sector. The S&P 500 is designed to be a leading indicator of U.S. equities.

[4] In this context, "backtesting" is the process by which a quantitative model – like the algorithm here – is applied to historical market data for certain securities (like prices of the ETFs) as if the model had actually been used to make investments in those securities during the earlier period. The result is the hypothetical performance of the model during a prior time period.

Hoffstein's algorithm, which featured what Present called a "dynamic volatility window",

offered better returns and better protection against risk than a simple moving average, because it

could adjust more effectively to changes in market conditions.[5] [*Id.* ¶32.]

On September 2, 2008, F-Squared entered into a Data Provider Agreement with

Newfound Research LLC ("NFR"), a firm Morton and Hoffstein formed to license the signals

from Hoffstein's algorithm. F-Squared received the right to use Hoffstein's signals for creating

investment strategies. In return, NFR would receive twenty basis points (0.2%) on all assets of

F-Squared's clients tracking those strategies. F-Squared was going to apply the signals to a

portfolio of ETFs.[6] The performance of that portfolio would be calculated and published daily

by NASDAQ. [*Id.* ¶33.]

By 2014, approximately $28.5 billion of invested assets tracked the AlphaSector indexes,

and F-Squared was the nation's biggest company among money managers building portfolios out

of exchange-traded funds. [*Id.* ¶6.] Present's compensation rose from almost $115,000 in 2008

to more than $6.2 million in 2013. [*Id.* ¶¶7-12.]

**Present's Public Statements about AlphaSector**

Even before F-Squared acquired the right to use signals from Hoffstein's algorithm,

Present began marketing a product that relied on them. On August 6, 2008, he told F-Squared

personnel that the company was negotiating with a "$2+ billion wealth manager" about a "sector

rotation model (7 year track record)", the model had returns of "20% per year for trailing

5 years", and $90 million was managed against the current version of the strategy. [Facts ¶38.]

---

[5] A "simple moving average" is a comparison between the price of a security and the moving average of
the price over a specified period of time. Present acknowledged that one can generate simple moving
averages with a set of historical prices and a computer program such as Excel. [Facts ¶22.]

[6] Consistent with some of Vargas's backtests, Present and Vargas were going to continue applying
portfolio construction rules that included equal weighting of the ETFs, a 25% cap per ETF, and monthly
rebalancing. [Facts ¶31.]

Between August 6 and August 21, he emailed a "tear sheet" to a number of outside contacts.[7]

The tear sheet showed the performance between December 2000 and May 2008 of a portfolio of

ETFs that incorporated signals from Morton Financial's algorithm, construction rules applied by

Present and Vargas, and F-Squared's AlphaCycle product.  Present told his contacts that "the

product has been run on a live basis since 12/2000" and "the historical track record … is a major

breakthrough on the marketing front."  [*Id.* ¶39.]

On September 5, 2008, Present sent his employees tear sheets showing the returns of a

"Sector Rotation Strategy" between April 2001 and July 2008.  He stated:

> We have compiled the pro forma "true" track record for the product.  It is a
> composite of three discrete data "engines" that Morton Financial used over the
> past 6.5 years, and it reflects the true calendar periods that each data engine was
> in use.

The performance figures did not come from Morton Financial.  To create the "track record",

Present told Vargas to "splice" signals from a 40-week simple moving average, 60-week simple

moving average, and Hoffstein's algorithm, applying each to different historical time periods.

[*Id.* ¶40.]

On September 18, 2008, F-Squared issued a press release for "AlphaSector Rotation" that

stated:

> Since 2001, the product has averaged 3% annualized excess return versus the
> S&P 500…  The buy and sell signals used in the product have been used to
> manage Private Client assets since 2001 and currently has [sic] over $100M in
> client assets linked to it…
>
> AlphaSector's buy and sell discipline has generated some timely and
> impressive investment decisions over the past year alone:
> ▪ Eliminated exposure to Financials in July of 2007…

---

[7] A "tear sheet" is a group of charts and tables created using a software package from Morningstar.  The package enables one to compare the performance of a particular investment strategy or product with the performance of standard references like the S&P 500.  [Facts ¶25.]

[*Id.* ¶41.]  On September 19, Present sent his employees a presentation for F-Squared's website.

The presentation stated, "The primary buy and sell triggers for each sector are quantitatively

based and in use since 2001 by a $3.9B wealth management firm."  [*Id.* ¶42.]  Present

immediately began sending the press release and presentation to his outside contacts.  [*Id.* ¶43.]

On October 14, 2008, F-Squared filed a Form ADV with language about AlphaSector

that Present had just added:

> *History of the Strategy*
> AlphaSector is built upon the monthly buy and sell indications from a proprietary
> analytical engine…  The developer of the strategy (analytical model and the
> corresponding portfolio construction methodology) is a multi-billion dollar
> wealth management firm that has been managing Private Wealth Client assets
> against the strategy since 2001.  As of the second quarter of 2008, this firm had
> over $100 million of client assets tracking the strategy…  F-Squared has slightly
> modified the portfolio construction approach that the wealth firm has used to
> create a more systematic approach…  The primary modifications were to set
> trading to once per month and to place a maximum cap on any sector position at
> 25% of the overall portfolio.

[*Id.* ¶44.]

In February 2009, Present began pitching AlphaSector to Virtus Investments, a mutual

fund manager.  He told Virtus that AlphaSector was based on a "proprietary analytical engine

developed over 7+ year period" by a multi-billion dollar wealth manager that had used the

strategy to manage client investments since 2001.  [*Id.* ¶¶45-52.]  In September 2009, F-Squared

entered into a Sub-Advisory Agreement with Virtus.  Two Virtus mutual funds began tracking

the AlphaSector Rotation Index, and Present was named as the portfolio manager.  [*Id.* ¶53.]

When Virtus submitted marketing materials to the Financial Industry Regulatory Authority

("FINRA") for approval, FINRA asked if AlphaSector's historical track record was hypothetical

and backtested.  Present responded with an October 12, 2009 letter that Virtus forwarded to

FINRA.  [*Id.* ¶54.]  The letter stated:

> The investment philosophy, portfolio construction methodology, and actual
> investment securities were established, and remained largely unchanged over the

past eight and one-half years.  The Index therefore explicitly does not reflect backtested data, but instead represents live, historical data.

Present included a "History of the AlphaSector Rotation Index" that stated:

> F-Squared engaged in an extensive due diligence effort to both validate the algorithms and timing of implementation of each enhancement...  After evaluating the trading strategy and patterns of the individual client accounts, it was determined by F-Squared that the monthly trading schedule was a reasonable extrapolation…  F-Squared decided on the 25% cap due to diversification and anti-concentration considerations.

[*Id.* ¶55.]

Over the next several years, Present made many similar representations and sometimes added new details.  In January 2010, he told *Investment Weekly News*, "Our AlphaSector Indexes have delivered, across two ugly bear markets, dramatically reduced downside losses, while outperforming the S&P 500 in most up markets."  [*Id.* ¶56.]  In May 2010, he told *Investment Management Weekly*, "[W]hen we see an individual sector like financials moving down, as happened in 2007, we get out of financials completely.  We eliminate it."  [*Id.* ¶57.]  In June 2010, he told Virtus personnel, "[I]n July of 2007, we sold out of financials.  We stayed out for two years, did not get back in again until June of 2009."  [*Id.* ¶58.]  He also told them that when terrorists attacked on 9/11, "we had 50 percent in cash [and] we went down one-half as much as the S&P did."  [*Id.* ¶59.]  He told them that over the past nine years, "we were able to save our clients 280 percentage points of value.  That's the excess return we extracted."  [*Id.* ¶60.]  The October 2010 edition of *Financial Planning*, posted on F-Squared's website, quoted Present as saying, "We eventually dropped the tech sector in 2001."  [*Id.* ¶61.]  In March 2011, Present told a client, "The core engine that drove decision-making has evolved over the years."  [*Id.* ¶62.]  In August 2011, he told the same client, "We went through a very extensive due diligence exercise, massive reams of data on our part."  [*Id.* ¶63.]  In November 2011, he told a *Fox Business*

interviewer, "[W]e beat the S&P eight of the last nine calendar years."  [*Id*. ¶64.]  On March 23,

2012, March 28, 2013, and June 24, 2013, F-Squared filed a Form ADV that stated:

> The investment models, portfolio design, and ETFs within the portfolio for our
> flagship US equity versions of the Indexes have been used to manage actual
> clients assets since April, 2001 (primarily in the form of SMAs [separately
> managed accounts]), and are therefore stress-tested across two bear markets and a
> bull market.

[*Id*. ¶65.]

## **Present's Knowledge and Recklessness**

Present told the world AlphaSector was based on signals from a strategy developed by a

multi-billion dollar wealth management firm (Morton Financial) that had used the strategy to

manage its clients' assets since 2001.  Present knew those statements were false.  He knew the

signals used by AlphaSector were actually generated by an algorithm that Hoffstein developed in

the summer of 2008.  [Facts ¶71.]  As a result, Present knew Morton Financial did not use

signals from Hoffstein's algorithm to manage real investments for real people since 2001.  He

knew no one used Hoffstein's algorithm for a strategy that was "stress-tested across two bear

markets and a bull market".  He knew no one began using Hoffstein's algorithm in 2001, and so

his claim that "we beat the S&P eight of the last nine calendar years" was false.  He knew no one

was using Hoffstein's algorithm when terrorists attacked on 9/11, and so his claim that "we had

50 percent in cash [and] we went down one-half as much as the S&P did" was false.  He knew

no one used signals from Hoffstein's algorithm to "eliminate exposure to Financials in July of

2007".  He knew no one used signals from Hoffstein's algorithm to "save our clients 280

percentage points of value" between 2001 and 2010.

Present told the world AlphaSector had a "historical track record" going back to April

2001. He knew that statement was false.  He knew AlphaSector's reported performance for the

period between April 2001 and June 2008 was not based on signals from Hoffstein's algorithm.

Present knew that, at his direction, Vargas had used trends for 40-week and 60-week simple

moving averages to calculate AlphaSector's supposed performance for those seven years.

[*Id.* ¶40.]  As a result, Present knew the 2001-2008 "historical track record" for the strategy that

F-Squared was marketing – a strategy that relied on signals from Hoffstein's algorithm – was not

actually calculated using the algorithm's signals.

Present told the world AlphaSector was based on a sector rotation strategy that Morton

Financial had used for its clients since 2001.  Even if Morton made such a statement (which he

has denied [*id.* ¶70]), Present has admitted his only source of information about Morton

Financial's trading strategy and investments for clients was conversations with Morton for which

Present has no notes.  [*Id.* ¶72.]  He has admitted he did not see trade blotters, an audited track

record, or other data reflecting investments for Morton Financial's clients; did not see any

documents reflecting the historical performance of a sector rotation strategy used at Morton

Financial since 2001; did not see any documents reflecting Morton Financial's use of simple

moving averages; did not see any documents identifying rules that Morton Financial used for a

sector rotation strategy;[8] and did not see any evidence that Morton Financial began applying a

sector rotation strategy to ETFs in April 2001.  [*Id.* ¶¶73a-e.]  He has admitted he had "no idea"

what the performance returns for Morton Financial's clients might have been; did not know how

many of Morton Financial's clients tracked a sector rotation strategy; did not know if any of

Morton Financial's clients invested in ETFs between 2001 and 2008; did not know whether

Morton Financial used signals for client investments in ETFs or other securities; did not know

how Morton Financial customized the strategy for individual clients; and did not know how often

---

[8] When asked at his deposition whether an email from Morton Financial in July 2008 stating "we are still testing different theories with regards to shorting as well as how to allocate" made clear that the firm did not have a set of portfolio construction methodologies to use with the algorithm, Present complained, "You're – you're reading it hyper-literally."  [Facts ¶24.]

Morton Financial rebalanced portfolios for individual clients.  [*Id*. ¶¶73f-k.]  He has admitted he did not think Morton Financial made an investment decision every time a signal changed; did not think Morton Financial had a standard approach for moving from ETFs to cash; did not think Morton Financial used a specific cap on the holding of any single ETF; and did not think Morton Financial used its sector rotation strategy only for ETFs.  [*Id*. ¶¶73l-o.]

Present told the world the "wealth manager" that originally developed the AlphaSector strategy had $2 to $4 billion of assets under management.  Even if Morton made such a statement (which he has denied [*id*. ¶70]), Present has admitted he never checked to see whether Morton was registered as an investment adviser;[9] had "no idea" about the number of Morton Financial's brokerage customers; had "no idea" how much money Morton made as a broker; had "no idea" whether Morton Financial exercised investment discretion for any clients; and did not see any document indicating that the firm had nearly $4 billion of assets under management.  [*Id*. ¶74.]

Present told Virtus (in his letter that Virtus submitted to FINRA to allay its concerns) that "F-Squared engaged in an extensive due diligence effort to … validate the algorithms and timing of implementation of each enhancement," and that F-Squared "evaluat[ed] the trading strategy and patterns of the individual client accounts."  [*Id*. ¶55.]  He told another client, "We went through a very extensive due diligence exercise, massive reams of data on our part."  [*Id*. ¶63.]  Present knew those statements were false.  He has admitted he felt that the actual historical performance of Morton Financial's sector rotation strategy was "not something [he] needed to consider".  [*Id*. ¶75a.]  He admitted he did not ask for documents showing how Morton Financial customized its sector rotation strategy for individual clients because "it didn't really matter" for his purposes.  [*Id*. ¶75b.]  He has admitted the actual performance of Morton Financial's sector

---

[9] If Present had checked Morton Wealth's Form ADV filed in June 2008, he would have seen that the firm had no advisory clients and no discretionary accounts and did not provide portfolio management services.  [Facts ¶14.]

rotation strategy for its clients was not "a concern of – or a consideration of ours at the time."

[*Id.* ¶75c.]  He has admitted he did not ask for "validation" about how much client money was

actually invested using Morton Financial's sector rotation strategy.  [*Id.* ¶75d.]  He has admitted

the only documents he reviewed for his "due diligence" on Hoffstein's algorithm were the

spreadsheets with signals received from Hoffstein in late August and early September 2008,[10] the

slides from Hoffstein's presentation at their meeting, and a couple of emails about timing.  [*Id.*

¶75e]  He has admitted his "due diligence" before F-Squared entered into the Data Provider

Agreement involved one meeting with Hoffstein and reviewing various backtested calculations

of potential returns that he received from Vargas.  [*Id.* ¶75f.]  He has admitted his analysis of

Hoffstein's algorithm consisted of Vargas's "initial calculation of a historical return" and

"qualitative assessment … to understand its effectiveness."  [*Id.* ¶75g.]  He has admitted his only

support for the sequence of "data engines" he told Vargas to use when creating AlphaSector's

supposed 2001-2008 track record was "the information from Hoffstein indicating the custom

engine came online in the summer of 2008" and one email from Morton "referring to a 2003 start

date for the 40-week."  [*Id.* ¶75h.]

## ARGUMENT

### I.    Present Violated Sections 206 and 207 of the Advisers Act and Related Rules

#### A.    The Relevant Statutes and Rules

Section 206 of the Advisers Act establishes "federal fiduciary standards to govern the

conduct of investment advisers."  *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11,

17 (1979).  Courts have imposed "an affirmative duty of utmost good faith, and full and fair

---

[10] On August 26, 2008, Hoffstein sent Present spreadsheets with weekly signals generated by his
algorithm starting with December 2000, January 2001, or March 2001 (depending on the ETF) and "trend
directions" for a 40-week simple moving average starting with October 2000.  On September 3, he sent
Present spreadsheets with weekly trend directions for a 60-week simple moving average starting with
February 2001.  [Facts ¶¶29, 34.]

disclosure of all material facts, as well as an affirmative obligation to employ reasonable care to

avoid misleading" clients. *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 194

(1963). Specifically, Section 206 makes it unlawful for an investment adviser:

> (1) to employ any device, scheme, or artifice to defraud any client or
> prospective client; (2) to engage in any transaction, practice, or course of
> business which operates as a fraud or deceit upon any client or prospective
> client; … (4) to engage in any act, practice, or course of business which is
> fraudulent, deceptive, or manipulative.

15 U.S.C. §80b-6. Section 206(1) requires scienter, Sections 206(2) and 206(4) do not.

*Steadman v. SEC*, 967 F.2d 636, 641-642, 647 (D.C. Cir. 1992).[11]

Section 207 makes it "unlawful for any person willfully to make any untrue statement of

a material fact in any registration application or report filed with the Commission under section

203 or 204, or willfully to omit to state in any such application or report any material fact which

is required to be stated therein."[12] 15 U.S.C. §80b-7. A finding of willfulness does not require

intent to violate (or scienter), but merely intent to do the act that constitutes a violation.

*Wonsover v. SEC*, 205 F.3d 408, 413-15 (D.C. Cir. 2000).

Section 206(4) authorizes the Commission to prescribe rules designed to prevent

violations. Rule 206(4)-1 prohibits a registered investment adviser from publishing, circulating,

or distributing advertisements that contain untrue statements of material facts or are otherwise

false or misleading. 17 C.F.R. §275.206(4)-1. Rule 206(4)-8 extends the prohibition on

---

[11] As president and CEO of F-Squared and portfolio manager of two Virtus funds, Present was an
investment adviser under Section 202(a)(11), which defines an "investment adviser" as a "person who, for
compensation, engages in the business of advising others ... as to the value of securities or as to the
advisability of investing in, purchasing, or selling securities…" 15 U.S.C. §80b-2(a)(11). *See Koch v.
SEC*, 793 F.3d 147, 156-157 (D.C. Cir. 2015) (owner/principal), *cert. denied*, 136 S.Ct. 1492 (2016); *SEC
v. Locke Capital Management, Inc*., 794 F.Supp.2d 355, 368 n.7 (D.R.I. 2011) (president/CEO); *SEC v.
Haligiannis*, 470 F.Supp.2d 373, 383 (S.D.N.Y. 2007) (control of management/investment decisions).

[12] Under Rule 204-1(e), an investment adviser's Form ADV is a report for purposes of Section 207.

fraudulent or deceptive acts or practices to the advisers of pooled investment vehicles, such as a mutual fund.  17 C.F.R. §275.206(4)-8.

**B.**      **Present's Violations of the Advisers Act**

Present took signals from an algorithm that a college intern developed in 2008, decided to apply the signals to sector ETFs, applied portfolio construction rules that the intern did not use, and paid NASDAQ to publish the performance of his ETF portfolio as the "AlphaSector Rotation Index".  F-Squared made money by selling the opportunity to make investments tracking the ETF portfolio.  Present chose to market his firm's brand-new investment strategy as if it had been developed by a multi-billion dollar wealth manager and had been used successfully to manage client assets since 2001.  The false statements described above were all variations on that basic theme.  Marketing AlphaSector as if it had a historical track record may have been "a major breakthrough on the marketing front" (as Present told his contacts in August 2008), but it was also fraudulent and deceptive.

*Raymond J. Lucia Cos., Inc. v. SEC*, 832 F.3d 277 (D.C. Cir. 2016), involved a similar pattern of misconduct.  Lucia and his firm marketed their "Buckets of Money" investment strategy with claims about how it had performed in the past.  The D.C. Circuit upheld the Commission's determination that they violated Sections 206(1), 206(2) and 206(4) of the Advisers Act, because they stated that the performance figures were based purely on historical data when the performance actually "relied on a mix of historical data and assumptions about the inflation rate and the rate of return," and because they presented the investment strategy "as so effective that it would have weathered historical periods of market volatility, and nowhere suggested that they were presenting mere abstract hypotheticals."  *Id*. at 290.  Lucia acted with

scienter, because he knew or must have known of the risk of misleading potential clients about the performance calculations.  *Id*. at 294.

The case against Present is even more compelling – and appropriate for summary judgment.  There is no dispute Present repeatedly told clients, potential clients, the financial press, and the Commission that AlphaSector was based on an investment strategy developed by a multi-billion dollar wealth manager, the strategy had been used to make investments for clients since April 2001, and the strategy had consistently outperformed the S&P 500.  There is no dispute Present knew AlphaSector relied on signals from Hoffstein's algorithm, which was not available until the summer of 2008, and so the AlphaSector strategy he was marketing to clients had not been in use since 2001.  [Facts ¶71.]  There is no dispute Present knew AlphaSector's "historical track record" for 2001 to 2008 was actually calculated by Vargas after-the-fact using simple moving averages, a metric that (as Present has admitted) anyone with historical prices and a computer can calculate.  [*Id*. ¶30.]

Present knew no reasonable investor would realize that when he announced AlphaSector used a "proprietary engine … in use for nine years", he actually meant Morton Financial's use of simple moving averages.  [*Id*. ¶58.]  He knew no reasonable investor would realize that when he proclaimed "we sold out of financials" in July 2007 and "we stayed out for two years", he actually meant the word "we" to refer to "the application of the index in a collective sense".  [*Id*.]  He knew no reasonable investor would realize that when he boasted "we were able to save our clients 280 percentage points of value … for the last nine years", he actually used the term "our clients" as "a euphemistic reference to anybody who would have been able to track it [the index] at that point".  [*Id*. ¶60.]  In short, he knew no reasonable investor would realize that his bold assertions – "we dropped the tech sector in 2001", "we had 50 percent in cash" on 9/11, "we got

out of financials in 2007", and "we were able to save our clients 280 percentage points of value",

etc. – actually referred to a hypothetical investor who was following an index that did not yet

exist, using simple moving averages that practically anyone with a computer could calculate.

Present knew no reasonable investor would hear his claims – F-Squared "engaged in an

extensive due diligence effort", "went through … massive reams of data", and "evaluat[ed] the

trading strategy and patterns of [Morton Financial's] individual client accounts" – and realize

that his "due diligence" consisted only of looking at Hoffstein's slides from their meeting and at

the possible performance scenarios calculated by Vargas, or realize that Present had made no

effort to learn how Morton Financial actually used a sector rotation strategy for its clients, or

even to confirm that Morton Financial actually had such a strategy.   [*Id.* ¶¶74-75.]

Because he engaged in a five-year campaign of misinformation about AlphaSector,

Present violated Sections 206(1), 206(2) and 206(4) of the Advisers Act.  Because some of his

false statements appeared in F-Squared's Form ADV, he violated Section 207.  Because some of

his false statements were made to the Virtus mutual funds, which are pooled investment vehicles,

he violated Rule 206(4)-8.  Because F-Squared was an investment adviser and he put some of his

false statements in its advertising materials, he aided and abetted F-Squared's violations of Rule

206(4)-1.[13]  *See SEC v. Locke Capital Management, Inc.*, 794 F.Supp.2d 355, 368 (D.R.I. 2011)

---

[13] F-Squared admitted that its conduct violated the federal securities laws and consented to the entry of an administrative order that it cease and desist from violations of Sections 204(a), 206(1), 206(2), 206(4) and 207 of the Advisers Act and Rules 206(4)-1, 206(4)-7 and 206(4)-8 and Section 34(b) of the Investment Company Act, pay disgorgement of $30 million, and pay a penalty of $5 million.  *In the Matter of F-Squared Investments, Inc.*, Release No. IA-3988, 2014 WL 7243183 (Dec. 22, 2014).

Virtus consented to the entry of an administrative order that it cease and desist from violations of Sections 204, 206(2), and 206(4) of the Advisers Act and Rules 204-2, 206(4)-1, 206(4)-7, and 206(4)-8 and pay disgorgement of $14.5 million (including interest).  *In the Matter of Virtus Investment Advisers, Inc.*, Release No. IA-4266, 2015 WL 7179719 (Nov. 16, 2015).

(summary judgment under §206(4) and Rule 206(4)-1 against adviser who fabricated major

client and inflated her firm's assets under management in advertising materials).

II.     **A Final Judgment Should Enter against Present for a
        Permanent Injunction, Disgorgement, and a Civil Penalty**

        A.     **Permanent Injunction**

Section 209(d) of the Advisers Act provides that the Commission may seek a permanent

injunction against future violations by an investment adviser.  15 U.S.C. §80b-9(d).  "An

injunction is appropriate if the Court determines there is a reasonable likelihood that the

defendant will violate the laws again in the future."  *SEC v. Tropikgadget FZE*, 2016 WL

4582248, *7 (D.Mass. Aug. 31, 2016).  To assess the likelihood of future violations, a court

"looks to whether a defendant's violation was isolated or part of a pattern, whether the violation

was flagrant and deliberate or merely technical in nature, and whether the defendant's business

will present opportunities to violate the law in the future."  *Id*.  *See also SEC v. Druffner*, 517

F.Supp.2d 502, 513 (D.Mass. 2007), *aff'd sub nom. SEC v. Ficken*, 546 F.3d 45 (1st Cir. 2008).

Here, the need for a permanent injunction is compelling.  The undisputed facts establish

that Present had a five-year track record of making false statements about AlphaSector, which

was the ticket to F-Squared's success and his own compensation.  It is clear from his deposition

testimony that he does not think he did anything wrong.  Although F-Squared is defunct, his

longtime experience in the financial industry creates the risk that Present will once again try to

market an investment product by making false statements.  Accordingly, a permanent injunction

is appropriate here.  *See SEC v. Locke Capital*, 794 F.Supp.2d at 369 (adviser invented major

client and inflated firm's assets under management for several years).

### B.   **Disgorgement**

Disgorgement is an equitable remedy "designed to deprive a wrongdoer of his unjust enrichment and to deter others from violating the securities laws." *SEC v. First City Financial Corp., Ltd.*, 890 F.2d 1215, 1230 (D.C. Cir. 1989). "The deterrent effect of SEC enforcement action would be greatly undermined if securities law violators were not required to disgorge illicit profits." *SEC v. Druffner*, 517 F.Supp.2d at 511 (quoting *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1104 (2nd Cir.1972)). The amount of disgorgement "need only be a reasonable approximation of profits causally connected to the violation," and the "risk of uncertainty in calculating disgorgement should fall on the wrongdoer whose illegal conduct created that uncertainty." *SEC v. Happ*, 392 F.3d 12, 31 (1st Cir. 2004) (quoting *SEC v. First City*, 890 F.2d at 1231-32).

Here, the basis for an order of disgorgement is clear. The undisputed facts establish Present began making false statements – that his brand-new AlphaSector strategy was actually old and successful – on August 6, 2008. [Facts ¶38.] At the time, F-Squared was a failure. It had lost money for three years and was having trouble meeting its payroll. [*Id*. ¶5.] Present knew marketing a nonexistent historical track record for AlphaSector was "a major breakthrough on the marketing front". [*Id*. ¶39.] His deceptive scheme worked. The success of AlphaSector turned F-Squared into the largest firm of its kind. [*Id*. ¶6.] Present received $11,093,029 from F-Squared from August 2008 through 2013.[14] Accordingly, Present should be ordered to disgorge $11,093,029. *See Locke Capital*, 794 F.Supp.2d at 369 (fees received after adviser began touting inflated assets under management).

---

[14] Present received $114,583 from F-Squared in 2008. [Facts ¶7.] On a prorated basis, he made $47,743 between August and December 2008. He received $350,000 in 2009, $250,000 in 2010, $636,764 in 2011, $3,589,715 in 2012, and $6,218,807 in 2013. [*Id*. ¶¶8-12.]

"Prejudgment interest, like disgorgement, prevents a defendant from profiting from his securities violations." *SEC v. Druffner*, 517 F.Supp.2d at 512 (quoting *SEC v. Sargent*, 329 F.3d 34, 41 n.1 (1st Cir.2003)).  An award of prejudgment interest "is necessary to prevent [the defendant] from receiving the benefit of what would otherwise be an interest-free loan."  *Id*. at 512.  Accordingly, Present should be ordered to pay prejudgment interest on the disgorgement amount, calculated by applying the tax-underpayment rate in 26 U.S.C. §6621(a)(2).  *See Locke Capital*, 794 F.Supp.2d at 369; *SEC v. Druffner*, 517 F.Supp.2d at 512.

### C.   <u>Civil Penalty</u>

Section 209(e) of the Advisers Act authorizes a court to impose a civil penalty for certain violations.  15 U.S.C. §80b-9(e).  By enacting penalty provisions such as Section 209(e), Congress sought "to achieve the dual goals of punishment of the individual violator and deterrence of future violations."  *SEC v. Eiten*, 2014 WL 4965102, *2 (D.Mass. Sept. 30, 2014) (quoting *SEC v. Kenton Capital, Ltd*., 69 F.Supp.2d 1, 17 (D.D.C. 1998)).  For violations that involve fraud, deceit or manipulation and that directly or indirectly result in or create the risk of substantial losses to others, the statute authorizes a "third-tier" penalty in an amount up to the greater of $150,000 per violation or the defendant's gross pecuniary gain as a result of the violation.[15]  The decision to impose a penalty is for the court's discretion.  Courts have considered such factors as the egregiousness of the defendant's conduct, the recurrent nature of the defendant's conduct, the degree of the defendant's scienter, and whether the defendant has admitted any wrongdoing.  *SEC v. Payton*, 2016 WL 3023151, *4 (S.D.N.Y. May 16, 2016); *SEC v. Eiten*, 2014 WL 4965102 at *2.

---

[15] *See* 17 C.F.R. §§201.1004 & 201.1005 (inflation-adjusted third-tier maximum penalty of $150,000 for violation occurring after March 3, 2009 and before March 5, 2013).

As set forth above, the undisputed facts establish that Present had a five-year track record of making false statements about AlphaSector – thereby enabling F-Squared to acquire billions of dollars in assets under management and himself to receive more than $11 million in compensation – and knew his statements were false.  It is clear from his deposition testimony that Present does not think he did anything wrong.  Accordingly, a third-tier penalty – the greater of $150,000 per violation or his gross pecuniary gain ($11,093,029) – would be appropriate.

## CONCLUSION

For the reasons set forth above, the Court should enter summary judgment against Present that: (a) permanently enjoins him from future violations of the relevant securities laws; (b) requires him to pay disgorgement of $11,093,029 with prejudgment interest calculated since August 6, 2008; and (c) requires him to pay an appropriate civil penalty.

Respectfully submitted,

/s/ Frank C. Huntington
Frank C. Huntington  (BBO No. 544045)
Rachel E. Hershfang  (BBO No. 631898)
Jennifer A. Cardello  (BBO No. 657253)
**SECURITIES AND EXCHANGE COMMISSION**
Boston Regional Office
33 Arch Street, 24th Floor
Boston, MA  02110
(617) 573- 8960 (Huntington phone)
huntingtonf@sec.gov

Dated:  October 28, 2016

## CERTIFICATE OF SERVICE

I hereby certify that this document was filed on this date through the ECF system and will be sent to the registered participants as identified on the Notice of Electronic Filing (NEF) as of the date of this filing.

/s/ Frank C. Huntington

Dated: October 28, 2016