02:27:17

 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2

 3       - - - - - - - - - - - - - - - - - - x

 4       SECURITIES AND EXCHANGE COMMISSION,   :

 5              Plaintiff,                     :    Civil Action No.
                                                   1:14-cv-14692-LTS
 6          v.                                :

 7       HOWARD B. PRESENT,                    :

 8              Defendant.                     :

 9       - - - - - - - - - - - - - - - - - - x

10

11          BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

12
                               MOTION HEARING
13

14
                          Thursday, July 27, 2017
15                             2:27 p.m.

16

17

18            John J. Moakley United States Courthouse
                         Courtroom No. 13
19                      One Courthouse Way
                       Boston, Massachusetts

20

21

22                     Rachel M. Lopez, CRR
                       Official Court Reporter
23               One Courthouse Way, Suite 5209
                  Boston, Massachusetts  02210
24                     raeufp@gmail.com

25

1                      **A P P E A R A N C E S**

2

   On behalf of the Plaintiff:

3

        UNITED STATES SECURITIES AND EXCHANGE COMMISSION
4       BY:  RACHEL E. HERSHFANG AND JENNIFER A. CARDELLO
        33 Arch Street
5       23rd Floor
        Boston, Massachusetts  02110
6       (617) 573-8987
        hershfangr@sec.gov
7       cardelloj@sec.gov

8

9  On behalf of the Defendant:

10       COLLORA, LLP
        BY:  ANTHONY E. FULLER AND JUSTIN P. O'BRIEN
11      100 High Street
        20th Floor
12      Boston, Massachusetts  02110
        (617) 371-1000
13      afuller@collorallp.com
        jobrien@collorallp.com
14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

09:38:20  1

10:01:24  2              (In open court.)

01:22:17  3              THE DEPUTY CLERK:   The United States District Court

01:22:18  4      for the District of Massachusetts is now in session, the

02:27:45  5      Honorable Leo T. Sorokin presiding.

02:27:45  6              Today is July 27th, the case of Securities and

02:27:52  7      Exchange Commission vs. Present, civil action 14-14692 will

02:27:52  8      now appear before this Court.

02:27:55  9              Counsel, please identify themselves for the record.

02:27:57 10              MS. HERSHFANG:   Good afternoon, Your Honor,

02:27:59 11      Rachel Hershfang for the Securities and Exchange Commission.

02:28:02 12      With me at counsel table is Jennifer Cardello.

02:28:05 13              THE COURT:   Good afternoon.

02:28:09 14              MR. FULLER:   Good afternoon, Your Honor, Anthony

02:28:11 15      Fuller and Justin O'Brien for Howard Present.

02:28:14 16              THE COURT:   All right.   Good afternoon.

02:28:18 17              So I know it's the SEC's motion.   But actually, my

02:28:23 18      first question is for the two of you, which is this:   This is

02:28:26 19      what I'm trying to understand.   Since you've clearly

02:28:30 20      unambiguously and expressly and repeatedly, not just in these

02:28:34 21      filings, disclaimed any intention to proceed on the

02:28:38 22      affirmative defense of advice of counsel, so you're not doing

02:28:40 23      that, my question is, what do you want to introduce that the

02:28:48 24      lawyers said, and what do you want to argue from that?   And

02:28:53 25      what do you want the jury to be instructed on from that?

02:29:01  1          MR. FULLER:  Your Honor, that's a good question.

02:29:02  2   There's a big record of evidence that Mr. Present and

02:29:07  3   F-Squared consulted attorneys on a number of different

02:29:09  4   things.  I think we pointed out in our brief --

02:29:11  5          THE COURT:  So let me -- I understand.  So I can

02:29:13  6   see from reading this that one thing that you would want to

02:29:16  7   say -- that you want to say might be the following:  You

02:29:19  8   might have -- I don't know if Mr. Present is going to testify

02:29:22  9   or if somebody is going to call him, but suppose -- I could

02:29:28 10   imagine somebody, him, getting up on the witness stand and

02:29:32 11   say, "I wanted to create a culture of compliance."  You

02:29:35 12   referred to something like that in your papers.  So he says,

02:29:39 13   "And here's nine ways I tried to do it.  I" -- whatever might

02:29:44 14   be, "I appointed a compliance officer in 2007, or I" --

02:29:50 15   whatever he did.  "And I spent thousands of dollars on

02:29:53 16   lawyers.  And over this period of time that we're talking

02:29:55 17   about, I, you know, called lawyers 82 times and asked them

02:29:59 18   questions, and I wrote to lawyers 52 times and I did lots of

02:30:05 19   different things over a period of time seeking advice.

02:30:08 20   That's one thing I did that shows my -- in trying to show my

02:30:12 21   good faith, or that I" -- those are things that he did.

02:30:15 22          And I think you're arguing that those are things

02:30:17 23   that show his good faith, right?

02:30:20 24          MR. FULLER:  Yes.

02:30:21 25          THE COURT:  So one category of things is just

02:30:23  1    things he did, which, in some of the things he did don't

02:30:28  2    involve lawyers, necessarily, and some of the things he did,

02:30:31  3    that you're pointing to, involve lawyers.  And the way you

02:30:34  4    show them is like he called or he e-mailed or he wrote or

02:30:37  5    he --

02:30:38  6         MR. FULLER:  Yes.

02:30:38  7         THE COURT:  -- met with or he paid lawyers or the

02:30:41  8    company.  And but that's all -- none of that involves the

02:30:45  9    words of the lawyers.

02:30:46  10        MR. FULLER:  There will be involvement of the words

02:30:49  11   of the lawyers.  Now, the words of the lawyers -- the lawyers

02:30:53  12   don't remember what -- I think if you read some of the

02:30:58  13   excerpts, they don't even remember whether they gave advice,

02:31:01  14   which is unfathomable given you bill time and you were paid,

02:31:05  15   and obviously advice was given.

02:31:08  16        Mr. Present recalls advice he got.  He recalls

02:31:12  17   certain conversations that we put in the brief.  So it's

02:31:16  18   going to be more that just he had a compliance, a culture of

02:31:19  19   compliance that he built.  That's definitely part of it.

02:31:22  20        I mean, Your Honor, one of the big issues here that

02:31:24  21   I want to point out is this case, in a lot of ways, is going

02:31:27  22   to boil down to whether Mr. Present credibly could have

02:31:31  23   believed what Mr. Morton told him about what he had done with

02:31:35  24   the strategy.  And we believe there's substantial evidence to

02:31:40  25   support a basis to argue that it was, in fact, reasonable for

02:31:43  1    him to repeat those things.

02:31:45  2          And a big piece of that is the fact that he went to

02:31:47  3    lawyers, and the fact that he hired not just a lawyer, but he

02:31:52  4    hired the industry's best, which is one of the first things a

02:31:55  5    court would look at if we were asserting advice of counsel

02:31:58  6    defense:  Did you hire competent counsel?  He hired K&L

02:32:02  7    Gates.  And these aren't lawyers that he picked because he

02:32:05  8    cherry-picked people who might give him what he wanted here,

02:32:09  9    but he picked people who were the best.  And so that's a big

02:32:12  10   part of what we're going to say.

02:32:14  11         The other thing I think that separates this --

02:32:18  12   well, I'm not going to say they're the best, but it -- we

02:32:20  13   would like to elicit that through some evidence, that these

02:32:23  14   people are competent attorneys.  And he didn't

02:32:26  15   cherry-pick lawyers.  He didn't pick them because he could

02:32:26  16   steamroll them.

02:32:26  17         THE COURT:  I don't understand the SEC's argument

02:32:29  18   to be it's not credible because he hired a trust and estates

02:32:33  19   divorce lawyer in a small town who had never seen a

02:32:36  20   Securities transaction before in their life.  That's not

02:32:38  21   their argument.  You might have to put in evidence that they

02:32:41  22   were competent, or what have you, if you want to make out

02:32:43  23   whatever you want to make out, but that's not the focus.

02:32:46  24         MR. FULLER:  Well, my -- no, my point, Your Honor,

02:32:48  25   was just that the way that the complaint is alleged is

| | | |
|---|---|---|
| 02:32:50 | 1 | Mr. Present engaged in outright fraud.  He purposely -- |
| 02:32:54 | 2 | THE COURT:  But is your argument -- is part of your |
| 02:32:58 | 3 | argument -- well, coming back to the lawyers. |
| 02:33:00 | 4 | MR. FULLER:  Yes. |
| 02:33:01 | 5 | THE COURT:  So part of what you -- I think what |
| 02:33:04 | 6 | you're telling me is Mr. Present is going to say, "This is |
| 02:33:08 | 7 | what the lawyers told me," because you don't have the lawyer |
| 02:33:11 | 8 | on the witness stand to be able to say, "This is what I told |
| 02:33:13 | 9 | him."  Because the lawyer in discovery says, in your view, "I |
| 02:33:17 | 10 | don't remember what I said to him." |
| 02:33:20 | 11 | MR. FULLER:  In one instance, Your Honor, I can |
| 02:33:21 | 12 | give a concrete example.  And it's in our brief.  In |
| 02:33:25 | 13 | September of 2008 -- I mean, to give you some context, |
| 02:33:30 | 14 | because this all needs to be understood in context, F-Squared |
| 02:33:33 | 15 | was marketing something different than what this product is |
| 02:33:37 | 16 | at this issue here.  The company was focused around another |
| 02:33:40 | 17 | product in the summer of 2008 called "AlphaCycle," which is a |
| 02:33:44 | 18 | totally separate product.  K&L Gates advised on that.  And |
| 02:33:48 | 19 | then he's trying to sell that into Morton and then learns |
| 02:33:51 | 20 | about this strategy that Morton has.  And you heard a lot |
| 02:33:54 | 21 | about that in summary judgment. |
| 02:33:55 | 22 | And so it's in that context that you see an e-mail |
| 02:33:59 | 23 | in -- on September, I think it's 8th, 2010, and Mr. Present |
| 02:34:03 | 24 | e-mails Rebecca Radford and says, "I'd like to have a call |
| 02:34:07 | 25 | with you about a new product and the use of track records." |

02:34:10 1   And there's a billing entry for an hour where she mentions

02:34:13 2   that.  Mr. Present has a recollection, a general

02:34:16 3   recollection, of discussing with her what the new product

02:34:18 4   was, and her saying that it was okay to do what he wanted to

02:34:21 5   do.  And that's in the broader context of this AlphaCycle

02:34:25 6   product that he had already brought to market.

02:34:27 7           So that's an instance where, yes, we're going to

02:34:30 8   have -- Mr. Present is going to repeat his recollection of

02:34:33 9   what was said, and I don't believe Ms. Radford can remember.

02:34:38 10  So that is an example there.

02:34:39 11          THE COURT:  So he's going to say, "I met with her."

02:34:41 12  She might have records that refresh her recollection and

02:34:42 13  says, "I know I met with him, because here is my billing

02:34:44 14  record."

02:34:44 15          MR. FULLER:  Or it was a phone call.  It wasn't a

02:34:46 16  meeting.

02:34:46 17          THE COURT:  Phone call.  All right.  And she says,

02:34:49 18  "I don't know what we talked about, or I don't remember what

02:34:51 19  I specifically said."  And he's going to say, "This is what

02:34:54 20  she said."

02:34:54 21          And then what's the purpose of that, or what are

02:34:56 22  you going to argue from that, and why isn't that an advice of

02:35:00 23  counsel defense?

02:35:01 24          MR. FULLER:  Well, I mean one of the -- well, it's

02:35:03 25  two questions.  The purpose of that is again to show that to

02:35:08  1    the extent that the SEC is saying he's a fraudster, the idea

02:35:11  2    that a fraudster is going to call a lawyer to discuss -- I

02:35:15  3    think it undermines that concept.  To the extent the SEC has

02:35:19  4    to prove that he acted recklessly or that he acted

02:35:22  5    negligently, the cases discuss and particularly the *Howard* --

02:35:25  6    the D.C. Circuit case in *Howard* discusses the fact that this

02:35:29  7    evidence of seeking attorney's counsel isn't an affirmative

02:35:35  8    defense of advice of counsel.  It goes into the bucket of

02:35:38  9    good faith that defeats, or it -- actually due care that

02:35:43 10    rebuts this negligence concept that he acted negligent or

02:35:47 11    even that he acted recklessly.

02:35:49 12           So that's the purpose of why isn't it advice of

02:35:52 13    counsel, pure advice of counsel.  Because, I mean, most of

02:35:55 14    these cases, as I read them, involves a discreet event, like

02:35:59 15    the signing of a 10k or some public filing where the CEO or

02:36:05 16    whoever it might be is signing something, and it turns out to

02:36:08 17    be false or something wrong.  And he may not have interacted

02:36:12 18    with the lawyers, but he knew these lawyers had approved it

02:36:15 19    and he signed it, and so there's litigation about that.

02:36:17 20           In this case, as you can see from the record, this

02:36:21 21    was an iterative process.  The process -- as they said

02:36:25 22    before, he has a separate product, AlphaCycle.  AlphaSector

02:36:26 23    comes on the scene, he develops the product.  He's consulting

02:36:29 24    with lawyers.  There's a period of time where he doesn't

02:36:30 25    consult with them, until the Virtus question comes up in

02:36:37   1   October/November of 2009.

02:36:37   2          And by the way, there's a parallel set of facts,

02:36:40   3   where Mr. Morton is communicating with Mr. Present, again,

02:36:40   4   giving him good reason to believe everything he's been told

02:36:46   5   is true.  So that's going along in a parallel fashion.  And

02:36:51   6   at that point in time --

02:36:53   7          THE COURT:  Well, does he ever say to the lawyers,

02:36:56   8   "This is what Morton told me about what happened prior to

02:37:01   9   2007.  And this is everything he told me, and is it

02:37:04  10   reasonable for me to rely on that to say whatever said in

02:37:11  11   phone calls or the" --

02:37:13  12          MR. FULLER:  So Your Honor, the best evidence of

02:37:14  13   that -- the answer is yes.  The best evidence of that is

02:37:19  14   Exhibit 13 to Ms. Hershfang's declaration, which is -- which

02:37:32  15   came out of the K&L Gates' files, which was a letter that

02:37:32  16   Mr. Present drafted.  And the very issue, by the way -- so

02:37:35  17   F-Squared -- this product, AlphaSector, didn't really have

02:37:37  18   any -- the first real business it got was through Virtus, and

02:37:42  19   Virtus was the first big client that actually purchased the

02:37:44  20   product.  And this is in -- they signed the contract prior,

02:37:48  21   but it wasn't approved by FINRA, as we know, because of this

02:37:51  22   issue about the backtested returns.  So Mr. Present drafts

02:37:56  23   this document.

02:37:57  24          And if you have it in front of you -- I don't know

02:38:00  25   if you do.

02:38:00 1          THE COURT:  I'm not sure at the moment.

02:38:02 2          MR. FULLER:  I can put it on the Elmo, if that

02:38:04 3   would be helpful.

02:38:05 4          THE COURT:  Sure.

02:38:35 5          MR. FULLER:  So this is a letter that the Court may

02:38:38 6   be familiar with, that Mr. Present drafted.  The context,

02:38:41 7   Your Honor, is that FINRA has told Virtus, "You can't" -- "we

02:38:45 8   can't accept the advertiser, because this is a backtested

02:38:49 9   performance."  And Mr. Present is pointing out in this letter

02:38:52 10  that it wasn't backtested, under that definition that he

02:38:56 11  understood, because it was -- utilized live assets.

02:38:59 12         THE COURT:  All right.

02:39:00 13         MR. FULLER:  And you can see, this is Rebecca

02:39:03 14  Radford's handwriting on there.  She testified that that's

02:39:07 15  her handwriting.  She doesn't recall this.  Attorney Caccese,

02:39:10 16  who's another K&L Gates lawyer, whose is -- I think

02:39:15 17  Ms. Radford might refer to him as the guru on performance

02:39:16 18  advertising.

02:39:17 19         And by the way, as I understand performance

02:39:20 20  advertising and as Mr. Caccese testified, it's not as if you

02:39:25 21  could pull a volume from an SEC rule book, and it's very

02:39:28 22  clear what you can and can't do.  You have to cobble together

02:39:32 23  no-action letters and different public pronouncements to

02:39:35 24  figure out what it is.  And that's why Mr. Present went to

02:39:39 25  K&L Gates, so they could advise him, but that's just a side

02:39:45  1    point.

02:39:46  2              But if you look there on that first page, Your

02:39:48  3    Honor, he mentions it --

02:39:48  4              THE COURT:  The highlighted portion down the

02:39:51  5    middle, the investment philosophy, that section there?

02:39:54  6              MR. FULLER:  There's that.  I don't want to belabor

02:39:57  7    it too much.  But here he talks about clarifying the legal

02:40:01  8    disclosures, that you may recall from the SEC's brief, they

02:40:05  9    discuss how they were altered and there was a comparison

02:40:08  10   document.  Here he's explaining the clarification regards

02:40:11  11   F-Squared legal disclosures, indicating that --

02:40:14  12             THE COURT:  All right.  So he wrote this.

02:40:15  13             MR. FULLER:  So he writes it.  There's more,

02:40:18  14   though, about what the prior --

02:40:20  15             THE COURT:  But what's the --

02:40:21  16             MR. FULLER:  -- wealth manager did.

02:40:21  17             What's that?

02:40:22  18             THE COURT:  What's the legal advice you rely upon?

02:40:25  19             MR. FULLER:  Well, let me just finish, because I

02:40:27  20   want you to understand, if you don't mind.

02:40:29  21             THE COURT:  All right.

02:40:30  22             MR. FULLER:  He talks about what the -- because the

02:40:31  23   original question was, what evidence do we have that he told

02:40:34  24   the lawyers what Morton had done?  And in this letter, he

02:40:34  25   describes the strategies have been utilized to manage high

02:40:38 1   network client accounts since 2001.  And as such, he --

02:40:44 2   customization relative to the client's individual account.

02:40:46 3   He goes on to say various things about what Morton had told

02:40:52 4   him.  He even discusses, I believe, the rebalancing of the

02:41:00 5   portfolio.  He discusses, on the next page, the fact that the

02:41:08 6   strategy utilized -- went to cash.

02:41:09 7        So if you look at this document and read it

02:41:11 8   carefully, in it are all the things he understood Morton to

02:41:15 9   have done and he reasonably believed.  And this is in the

02:41:18 10  hands of his attorneys in November -- or yeah, end of

02:41:21 11  November 2009, before really any money has poured into this

02:41:25 12  product.

02:41:25 13       So -- and Mr. Present will testify he reasonably --

02:41:29 14  he believes he discussed it with them, he recalls discussing

02:41:32 15  with them the fact that there were these different engines.

02:41:35 16  And he's meaning the forty-week, the sixty-week moving

02:41:38 17  average, and then the custom algorithm.  So this is out of

02:41:40 18  the lawyer's file.

02:41:41 19       She read it; Ms. Radford testified she must have

02:41:46 20  read it.  If you look at the bills, there's four-and-a-half

02:41:48 21  hours of time billed reviewing this.

02:41:50 22       And then one month later, in January of 2010,

02:41:55 23  Mr. Present sends a press release with the disclosure

02:41:58 24  language that the SEC claims is -- now claims is -- they take

02:42:02 25  issue with.  And that language is in that press release, one

02:42:06  1    month after they get this letter.

02:42:08  2          So what I'm saying is, Your Honor, we don't -- we

02:42:11  3    can't -- the lawyers don't remember what was said.  We have

02:42:14  4    records that show Mr. Present shared information, at least in

02:42:19  5    writing, and he has his memory of what he told them.

02:42:21  6          And then we have Deborah Deskavich, who was another

02:42:25  7    person involved with the company who interacted with the

02:42:28  8    lawyers, and she doesn't remember it.  All she remembers is

02:42:30  9    they did what the lawyers told them to do.  And so in an odd

02:42:34  10   way, there's no -- you know, there's no one memo that says

02:42:37  11   it's okay to do this and that.  It was an iterative process,

02:42:40  12   where information was shared, and I think -- we're going to

02:42:42  13   be able to demonstrate that Mr. Present was as transparent as

02:42:47  14   he could have been, both with his lawyers and internally.  It

02:42:50  15   wasn't like Morton was a secret within the company.  Other

02:42:53  16   people interact with him, knew that he had had this strategy.

02:42:56  17         And in fact, I don't know if the Court is aware of

02:42:59  18   this, but in November of 2009, Rick Tomney, an employee of

02:43:05  19   the company, calls over to Morton's shop to ask specifically

02:43:09  20   for what were the yearend assets going back to 2001.  And

02:43:12  21   somebody at that shop gives them to him, and he's going to

02:43:16  22   testify that's what he understood it was.

02:43:18  23         THE COURT:  Is that the handwritten list?

02:43:21  24         MR. FULLER:  That's the handwritten list.  Okay.

02:43:23  25   So does it make it any less important that it was handwritten

02:43:26  1    and they didn't get something -- you know, something fancy

02:43:28  2    with a stamp in it?  That can be argued to the jury.  But my

02:43:31  3    point is those are the things that led people to believe that

02:43:34  4    these things were true.  And it's the ultimate Monday morning

02:43:38  5    quarterback now to say it's false.  But the fact that he

02:43:41  6    shared this with lawyers along the way is a large part of the

02:43:44  7    good faith --

02:43:46  8            THE COURT:  So that -- all of that, so far, still,

02:43:49  9    though, Mr. Fuller, he -- you're saying he did all of these

02:43:53 10    things which show good faith.  In other words, he called

02:43:56 11    lawyers, he went to lawyers.  And that's obviously -- if

02:43:59 12    that's what you have, I understand why you're not advancing

02:44:02 13    the advice of counsel defense, because an advice of counsel

02:44:05 14    defense is necessarily predicated on what the lawyers said.

02:44:08 15    And what you are saying so far is that, look, he wasn't a

02:44:13 16    fraudster, because one piece of evidence that persuades the

02:44:17 17    jury that he's not a fraudster is he went to lawyers.  And he

02:44:20 18    did this and he told them all these things, which is based on

02:44:24 19    his testimony, as you anticipate it to be, what he knew about

02:44:28 20    how Morton did it.  And he laid it out there for them to

02:44:31 21    know.  So he's being candid, if you will.

02:44:36 22            But what -- from the lawyer -- I guess what I'm

02:44:40 23    still not clear on is what the lawyer said back.  Are you

02:44:43 24    relying on, and if -- why isn't that -- why isn't it an

02:44:49 25    advice of counsel defense then?  What's the difference

02:44:51  1    between what you want to do with it?

02:44:54  2            MR. FULLER:  Well, the difference, Your Honor --

02:44:55  3    well, as I understand it, to have an actual advice of counsel

02:44:58  4    defense, the defense undertakes a burden that if it's not

02:45:01  5    met, the evidence doesn't come in.  And so I mean, in a

02:45:04  6    sense, there's no -- the SEC, I believe their theory is, as I

02:45:08  7    understand their brief, there can't be an advice of counsel

02:45:11  8    because you never -- you never found out if there was a trade

02:45:15  9    blotter, and you never told your lawyers you hadn't looked at

02:45:16 10    a trade blotter.

02:45:18 11            THE COURT:  Trade blotter?

02:45:20 12            MR. FULLER:  From Jay Morton, showing that he had

02:45:23 13    utilized this strategy, you should have had a trade blotter.

02:45:27 14    That's one of the contentions.  And so using their framework,

02:45:30 15    I don't know how you combat that.  I mean, as I understand

02:45:32 16    it, Mr. Present tells the lawyers what he's doing.  There's

02:45:35 17    an interaction, and part of the advice is before you, "Do

02:45:38 18    this.  Or if you've done it, have you done X, Y, and Z."  And

02:45:42 19    he reasonably believed he didn't need to see trade blotters,

02:45:46 20    as did other people who brought the product, as did other

02:45:50 21    people who worked at F-Squared.

02:45:51 22            THE COURT:  Well, is he going to say a lawyer told

02:45:53 23    him he didn't need to see trade blotters?  Is he going to

02:45:57 24    affirmatively say that, "A lawyer told me, 'No, you don't

02:46:01 25    have to see trade blotters'?"

02:46:03  1          MR. FULLER:  Your Honor, it's not in the record

02:46:06  2     right now.

02:46:07  3          THE COURT:  Okay.

02:46:07  4          MR. FULLER:  I don't believe that is -- I don't

02:46:10  5     believe the trade blotter issue came up.  And again, what

02:46:13  6     we're dealing with is the SEC's sort of paradigm of what the

02:46:17  7     law is, and therefore, you can't assert it because you didn't

02:46:20  8     tell your lawyer these five things.

02:46:22  9          But I will say this, and again, these are why --

02:46:24 10     this is why this evidence is important.  Because they're

02:46:26 11     going to argue:  You never -- either you lied and told your

02:46:29 12     lawyer you'd seen the trade blotters, or you never told them

02:46:33 13     you didn't see the trade blotters.  Either way -- so that's,

02:46:37 14     I believe, where they would go.

02:46:38 15          But my point is this.  Why does he then hire, not

02:46:41 16     once but twice, someone to do a mock audit of his business,

02:46:45 17     to then go look and find the very records that he knows he

02:46:49 18     doesn't have?  It doesn't make sense.

02:46:51 19          THE COURT:  Are those statements from the lawyers

02:46:52 20     coming in for the truth of the matter asserted or the fact

02:46:55 21     that they were said to him?

02:46:57 22          MR. FULLER:  Well, we don't have an actual

02:46:58 23     statement from a lawyer, other than what's in their e-mails.

02:47:03 24          THE COURT:  Well, you have --

02:47:04 25          MR. FULLER:  But -- oh, you mean Rebecca Radford's

02:47:06  1    statement.  I mean, advice isn't subject to truth or falsity.

02:47:10  2    I think it's not really hearsay in the sense that they said

02:47:14  3    it.  So --

02:47:14  4              THE COURT:  It's really the affect on him, though.

02:47:17  5              MR. FULLER:  Yes.

02:47:17  6              THE COURT:  If you think about a hearsay sentence,

02:47:19  7    if allowed, there will be evidence of what lawyers said to

02:47:23  8    him and he heard it.  And so it's significant that he sought

02:47:28  9    it and that he heard it and, therefore, that shows his good

02:47:35 10    faith.  And so some of these documents you -- might be

02:47:39 11    offered just to show he told them these things, and that's

02:47:43 12    part of his good faith.  He was explaining things to them.

02:47:46 13              MR. FULLER:  That he was transparent, yes.  And

02:47:49 14    he -- again, someone who -- someone who it's not negligence.

02:47:55 15    There's a negligence aspect to this and a recklessness aspect

02:47:59 16    to the SEC's case, and this is inconsistent with conduct of

02:48:03 17    someone --

02:48:03 18              THE COURT:  So though, if an advice of counsel

02:48:06 19    defense situation, absent making out the defense, you don't

02:48:09 20    get to put in the evidence, the evidence you don't get to put

02:48:13 21    in in that scenario is the evidence of what the lawyer said,

02:48:18 22    right?

02:48:19 23              MR. FULLER:  I think it's any -- well, the SEC

02:48:22 24    wants us to not be able to mention the fact that he consulted

02:48:25 25    lawyers at all.  So I mean, first of all, I think the advice

02:48:29  1    of counsel -- I'm really focusing on the *Gorski* case and the

02:48:34  2    *Howard v. SEC* case.

02:48:37  3                    THE COURT:  Right.

02:48:38  4                    MR. FULLER:  But the strict parameters of advice of

02:48:40  5    counsel and the number of cases that the SEC cited is that

02:48:43  6    you don't get an instruction.  And maybe pretrial, you don't

02:48:47  7    get any of the evidence in, absent, you know, you making out

02:48:49  8    those elements or making a proffer of those elements, as I

02:48:52  9    understand it, which is another reason why I think it's

02:48:56  10   antiquated or not reflective of the law or reality.  Because

02:48:59  11   reality is advice is given in an iterative fashion over time,

02:49:04  12   oftentimes not in writing, on the phone, and there isn't an

02:49:06  13   ability for a defendant to make out the perfect defense, even

02:49:10  14   though he did have the good faith to engage the lawyers and

02:49:13  15   try to do the right thing.  And I think that's why *Gorski* and

02:49:17  16   this *Howard v. SEC* case reflect more the reality of how

02:49:23  17   lawyers and clients function.

02:49:25  18                   THE COURT:  Okay.  All right.

02:49:26  19                   MR. FULLER:  I mean, the other piece of evidence,

02:49:28  20   Your Honor, that I think is important and I would highlight

02:49:31  21   it, we tried to highlight it, which is --

02:49:35  22                   THE COURT:  So most of this evidence that you would

02:49:38  23   have would come in the following forms:  One, documents that

02:49:42  24   you're essentially -- either the e-mails back and forth

02:49:45  25   between the lawyers and Mr. Present or somebody in the -- at

02:49:49  1    his company, or the billing records and documents maintained

02:49:52  2    by the lawyers, or his testimony about what was said to him

02:49:58  3    and discussed?

02:50:01  4            MR. FULLER:  Yes.

02:50:01  5            THE COURT:  And then there might be a

02:50:03  6    here-and-there instance in which a lawyer is either going to

02:50:05  7    say, "Well, these document were in the record and I would

02:50:07  8    have read them," or, "Did I remember them saying this," or

02:50:11  9    something like that.

02:50:12 10            MR. FULLER:  Yes.  For example, the e-mail that I

02:50:14 11    just put up, which was a exhibit to our -- Mr. Present

02:50:20 12    commissions full review of the marketing materials by K&L

02:50:24 13    Gates, which --

02:50:24 14            By the way, there's no evidence in the record where

02:50:24 15    he said, "And don't review my disclosures."  There's just

02:50:29 16    nothing, no evidence that he ever said that.

02:50:30 17            But in any event, he commissions a full marketing

02:50:33 18    review in May of 2011, and Mr. Duggan is assigned to do it.

02:50:39 19    Again, there's billing entries that reflect numerous hours,

02:50:42 20    maybe less than ten, but not insignificant hours, where they

02:50:46 21    looked at all the marketing presentations.

02:50:48 22            THE COURT:  Where does this e-mail say that they're

02:50:50 23    going to do a top to bottom marketing?

02:50:53 24            MR. FULLER:  Oh, I'm sorry.  That's not -- that's

02:50:54 25    the precursor to this e-mail.  I don't think the SEC disputes

02:50:57  1    that the marketing view was done by the SEC; they may dispute

02:51:01  2    the breadth of it.

02:51:03  3            But in the context of that, there's a phone call.

02:51:05  4    And this is an e-mail Mr. Duggan sends where he says, "I just

02:51:10  5    had a call with Howard.  In his none too subtle way, he

02:51:10  6    wanted to make sure I understood that I was to get up to

02:51:12  7    speed on the advice Rebecca had given them on their index

02:51:14  8    business," and then he goes on, "mostly having to do with

02:51:18  9    presenting the backtested index returns as real, but not" --

02:51:19  10   and then he goes on, "not willing to pay for my getting up to

02:51:23  11   speed, which, again, is not an unusual sentiment from a

02:51:27  12   paying client, in my experience."

02:51:28  13           But Your Honor, this -- again, the SEC says in

02:51:31  14   their brief, there's -- no advice was given.  And again, this

02:51:35  15   reflects -- this is in 2011.  He clearly understands that

02:51:40  16   he's talked to Rebecca Radford, and he's been given advice.

02:51:44  17   I don't know if this is the right advice, I don't know if

02:51:47  18   Duggan wrote it down wrong.  He doesn't remember this.  But

02:51:50  19   we're putting forward -- this isn't -- there's meat on these

02:51:55  20   bones is what I'm trying to say, and this is an example of

02:51:58  21   that.

02:51:58  22           And so the idea that advice wasn't given is absurd.

02:52:03  23   Advice was given and relied on.  And it's not a perfect

02:52:07  24   record.  Obviously, we would like it to have been better, but

02:52:10  25   this is what we have.

02:52:11  1              THE COURT:  Okay.  All right.  That answers the

02:52:18  2   question that I was -- questions I was curious about from

02:52:21  3   you.  At least at the moment.

02:52:23  4              I'll hear from the SEC.

02:52:26  5              MS. HERSHFANG:  Thank you, Your Honor.  I think

02:52:28  6   I'll start where Mr. Fuller closed, and then I want to circle

02:52:33  7   back to the Court's questions, because I'm not sure that you

02:52:36  8   really got an answer to them.

02:52:41  9              This Mark Duggan e-mail that Mr. Fuller relies so

02:52:46 10   heavily on is of course not a statement of Mark Duggan.  It's

02:52:50 11   Mark Duggan quoting what Mr. Present told Mr. Duggan about

02:52:55 12   the advice he supposedly received from Ms. Radford.  And if

02:53:00 13   Your Honor looks in our reply brief, at footnote 3 on page 3,

02:53:05 14   you can see what Ms. Radford said when she was shown that

02:53:11 15   e-mail, which she had not seen before.  Just for the Court's

02:53:14 16   information, Ms. Radford had left K&L Gates by this count,

02:53:18 17   which is why a new lawyer came on to the scene.

02:53:21 18              Ms. Radford testified, that, one, she did not

02:53:24 19   recall having given such advice.  Unsurprising, she, as Mr.

02:53:31 20   Fuller correctly said, didn't recall much.  And two, and I'm

02:53:33 21   quoting now, I wouldn't say present something that isn't real

02:53:36 22   as real, because that to me sounds like fraud.  Closed

02:53:40 23   quotes.

02:53:40 24              So the notion that somehow this is an accurate

02:53:45 25   rendering of advice that Mr. Present received from a lawyer

02:53:50   1    is refuted in this record by that lawyer.

02:53:54   2              THE COURT:  But what about to the -- he wants --

02:53:59   3    let's say that what -- that Present wants to get up on the

02:54:04   4    witness stand and say, "I spoke to Radford in the time

02:54:09   5    period" -- he would have spoken to Radford before that

02:54:12   6    e-mail.  Because she's already left the firm by the time of

02:54:15   7    that e-mail, right?  Whatever that time period was.  "I spoke

02:54:18   8    to Radford and I asked her about index funds," or, "I asked

02:54:21   9    her about this issue, and this is what she told me."  And

02:54:23  10    whether he quotes her or says in a general way, and he

02:54:28  11    describes the advice he receives.

02:54:31  12              Now, to the extent they disagree on what she told

02:54:34  13    him, either because she specifically says, "No, I remember

02:54:39  14    that call, and that's not what I said," or she says, "Well, I

02:54:44  15    don't have a specific memory of that call.  But that's not

02:54:46  16    what I would have said, because this isn't the kind of

02:54:49  17    advice -- that isn't the kind of advice that I would have

02:54:52  18    given, given what you have described to me," why wouldn't

02:54:54  19    that be a fact question more for the jury?

02:54:59  20              MS. HERSHFANG:  Can I answer in at least two parts,

02:55:01  21    reserving the right to add additional parts as I go along?

02:55:05  22              THE COURT:  Yes.

02:55:06  23              MS. HERSHFANG:  I think part one -- and this may

02:55:08  24    seem a little elliptical, but I'm getting back to your

02:55:13  25    question, I promise.  You know, this is the moment, this

02:55:15  1   motion, when one would expect Mr. Present to put his best

02:55:19  2   foot forward with respect to what this evidence is.  And it

02:55:22  3   is stunning to me that if one looks through the exhibits that

02:55:25  4   he has attached to his opposition to our motion, there is not

02:55:28  5   a single example there of his having asked K&L Gates

02:55:37  6   in 2008, 2009, or 2010, to review and approve any of the

02:55:42  7   marketing materials that are at issue in this case.

02:55:48  8           Now, it is difficult for both parties that the

02:55:52  9   attorneys' memories seem to be so poor.  Having said that, it

02:55:58 10   doesn't seem to me that in the Court's exercise of its

02:56:04 11   gatekeeping function for a jury trial, the appropriate

02:56:07 12   response would be:  Well, if there's something he says he

02:56:11 13   remembered and they don't remember anything, let's just let

02:56:14 14   it all in.

02:56:15 15           I mean, if -- if Mr. Present did receive that

02:56:18 16   advice, shouldn't there be something he can point to in this

02:56:24 17   massive record that shows that he actually received that

02:56:28 18   advice?  And what he points to is this one, one-hour billing

02:56:37 19   record from K&L Gates, from September of 2008.  It's

02:56:41 20   September 10th.  And I don't expect Your Honor to look at

02:56:44 21   this right now, but the billing records were filed as

02:56:48 22   Exhibit 24 to our motion.  And it's one hour.

02:56:50 23           It involves three things:  One, call with Howard

02:56:53 24   Present regarding new products.  Two, preparation for and

02:56:57 25   call with F. Siegfried of F-Squared.  So one call preparing

02:57:00  1    for and having a third call.

02:57:03  2            Ms. Siegfried -- and this is all in the record, as

02:57:07  3    well -- remembers having her recollection refreshed by a

02:57:14  4    document, that the call that she had was about a new product,

02:57:17  5    and it was a new AlphaCycle product.

02:57:20  6            Now, as Mr. Fuller accurately said earlier today,

02:57:23  7    that was an entirely different product that F-Squared had

02:57:28  8    already developed and was selling in this time, in this

02:57:30  9    summer/fall of 2008.

02:57:33  10           For Mr. Present to be able to claw some shred of

02:57:39  11   that hour and testify about a memory with Rebecca Radford,

02:57:43  12   okay, assume for the moment it really did happen.  Assume

02:57:47  13   that he had the call with Ms. Radford, and she told him

02:57:51  14   something.  There is no record that she looked at anything,

02:57:53  15   that he sent her anything, that she approved anything.  As

02:58:00  16   Mr. Fuller just said, there was a long period where they

02:58:03  17   didn't even go to K&L Gates for their marketing materials.

02:58:07  18           And the record absolutely reflects that.  I mean,

02:58:09  19   it's a tedious task, I'll tell you, because I've done it, but

02:58:14  20   once I looked through these billing records -- and it is true

02:58:14  21   that he paid K&L Gates a lot of money, and it is true that

02:58:19  22   they did a fair amount of work for him.  But what you won't

02:58:23  23   see in there is a whole lot of work relating to the things

02:58:28  24   that this lawsuit is about.

02:58:29  25           And that brings me to my broader point about this

02:58:33  1    sort of lawyers in the atmosphere argument.  You know, it's

02:58:36  2    hard to think of an SEC case where it's not true that the

02:58:39  3    firm or the person we have sued don't have a chief compliance

02:58:43  4    officer, which by the way isn't some innovation but is

02:58:43  5    something that is required when you register as an investment

02:58:48  6    advisor; or an in-house counsel, which by the way, in this

02:58:51  7    case, she came on board in April 2013, three months before

02:58:55  8    this whole thing blew up; or outside counsel; or possibly an

02:58:59  9    entire legal department.  The fact that those people work at

02:59:03 10    a firm is simply not relevant to the claim against the firm,

02:59:09 11    unless there is some reason to believe that they advised the

02:59:13 12    firm about the issues that gave rise to the claim.

02:59:17 13         That's this case, Your Honor.  It's not relevant,

02:59:19 14    and it's extremely prejudicial.  I mean, we can forget this;

02:59:24 15    most of the people in this courtroom are lawyers or spend way

02:59:27 16    too much time with lawyers, and so we sort of disregard what

02:59:30 17    it means to be a lawyer.  But to the average juror, that's

02:59:34 18    like -- it's like kryptonite.  It's like a

02:59:38 19    get-out-of-jail-free card.  "Oh, he had lawyers around."

02:59:40 20         And that's what the advice of counsel framework is

02:59:43 21    for.  It's the means that's been developed, you know, by the

02:59:47 22    Supreme Court, back to the early 17th, 18th century, about --

02:59:53 23    I'm bad on my centuries -- 20th century, about how you deal

02:59:56 24    with this kryptonite.  You can't just throw it out there,

03:00:01 25    because people don't get it.

03:00:02  1          And so what you do is you provide them with a way

03:00:05  2     of thinking about it.  And the way of thinking about it

03:00:07  3     explicitly says -- and I love Judge Easterbrook's quote on

03:00:11  4     this from the *McNamee* case in the Seventh Circuit, "You can't

03:00:13  5     just talk about advice of counsel.  You can't put forward an

03:00:17  6     advice of counsel defense without producing actual advice

03:00:21  7     from an actual lawyer."  And it's clear on this record that

03:00:27  8     Mr. Present can't do that.

03:00:29  9          And as the Court pointed out earlier, that's a

03:00:31 10     really good reason to say that what you're not asking for is

03:00:35 11     an advice of counsel defense.  But then what is it?

03:00:40 12          And I would point the Court on that to the end of

03:00:44 13     Judge Forrest's decision in the *Tourre* case, where the short

03:00:49 14     version of *Tourre*, extremely complicated financial product

03:00:55 15     setup by Goldman, Tourre was kind of a little guy.  He's sort

03:01:00 16     of infamous as the only poor sap who was prosecuted in the

03:01:01 17     wake of the financial crisis.  And he wanted to put in

03:01:06 18     evidence that this -- that -- you know, he couldn't have been

03:01:09 19     acting with an intent to deceive about this product, because

03:01:13 20     it was reviewed by lawyers or he understood it was reviewed

03:01:16 21     by lawyers.

03:01:17 22          Remember, now this guy is not Mr. Present.  He's a

03:01:19 23     million degrees removed by anyone speaking with counsel.  So

03:01:24 24     he says, "This isn't an advice of counsel defense, but I want

03:01:27 25     to put in this stuff because it goes to my good faith."  And

03:01:30  1  Judge Forrest at the end of that decision says, "In light of

03:01:34  2  the clear concession that Tourre did not request advice from

03:01:37  3  counsel, that he does not claim that he ever provided all of

03:01:40  4  the information to counsel" -- and that another guy didn't

03:01:43  5  either -- "it would be irrelevant, misleading, or both, to

03:01:47  6  emphasize the presence of counsel in a case that is about the

03:01:51  7  appropriateness of disclosure.  Tourre may not suggest that

03:01:54  8  counsel blocked the relevant disclosures, because he is not

03:01:58  9  pursuing a defense based on such a fact."

03:02:06  10           THE COURT:  Okay.  So the thing that I'm wondering

03:02:11  11  about, though --

03:02:13  12           MS. HERSHFANG:  Yeah.

03:02:13  13           THE COURT:  -- is that his good faith or his intent

03:02:16  14  and state of mind is relevant to a number of the claims.  And

03:02:24  15  so evidence that bears on that, as a general matter, is

03:02:30  16  admissible.  And there may be somebody who -- for example, I

03:02:41  17  don't know if this exists, but somebody could have asked him,

03:02:44  18  "Well, why do you say it goes back to 2001, when your company

03:02:48  19  formed in 2007," whatever year it was.

03:02:51  20           And if he says, "Well, I talked to Jay Morton and

03:02:56  21  I -- and he told me these things and here's how we got

03:02:59  22  there," it doesn't mean that he lacks intent, but it would be

03:03:02  23  relevant -- it might be relevant evidence to show that

03:03:05  24  someone asked him and he told them this information and

03:03:10  25  that -- that that's where it came from, as opposed to him

03:03:13  1   saying, "I reviewed trade blotters."  If he said, "I reviewed

03:03:18  2   trade blotters," if you learned in discovery that he didn't,

03:03:21  3   you might point to that as evidence of bad faith.

03:03:25  4         And so in that sense, why isn't -- part of what I

03:03:31  5   hear you saying is that, look, lawyers are different; that

03:03:33  6   this example that I'm giving you or any others that we might

03:03:37  7   think of are ones that they're just pieces of evidence, and

03:03:41  8   the jury is capable of evaluating it.  And the moment you

03:03:44  9   say, "Well, you talked to lawyers," it somehow comes to a

03:03:47 10   higher plain, and so it has some extra potential

03:03:53 11   probativeness or unfair prejudice.

03:03:59 12         And but to the extent he has evidence about this

03:04:04 13   product that's at issue, he talked to lawyers about it, in

03:04:09 14   some way, and why shouldn't that be a piece of evidence, in

03:04:16 15   the ordinary course, that he gets to put in about his good

03:04:24 16   faith, subject to some explanation?  I guess that's the other

03:04:28 17   part of it, some explanation or limiting instruction or what

03:04:33 18   have you.

03:04:33 19         I mean, because otherwise, your answer, I think is,

03:04:36 20   "No, it's too -- it's kryptonite.  So even if it has some

03:04:40 21   relevance, you should keep it out, because the prejudice

03:04:43 22   outweighs the probativeness."

03:04:45 23         MS. HERSHFANG:  I think that's almost right.  I

03:04:47 24   guess I have a certain healthy skepticism, perhaps born of my

03:04:53 25   position in this particular lawsuit of uncorroborated

03:04:56  1    testimony.

03:04:56  2            THE COURT:  Right.  So partly you're also saying to

03:04:58  3    me -- saying, basically, "Judge, don't believe him.  It's

03:05:02  4    just so incredible that it doesn't survive the 104, if you

03:05:07  5    will.  You should just keep it out, because it's like not

03:05:10  6    credible at all, that, in fact, he received this kind of

03:05:13  7    advice that he's saying he received."

03:05:16  8            MS. HERSHFANG:  I guess I won't try to intrude on

03:05:19  9    the credibility determination, but it does seem to me that

03:05:22 10    faced with a record that shows no -- no tangible evidence --

03:05:25 11    I mean, we have every document that went back and forth to

03:05:29 12    K&L Gates and to Seward & Kissel.

03:05:32 13            THE COURT:  So there's no written advice.

03:05:34 14            MS. HERSHFANG:  There's no written advice.  There's

03:05:36 15    no evidence of his --

03:05:37 16            THE COURT:  Other than the press release and the

03:05:38 17    handwritten notes on it.

03:05:40 18            MS. HERSHFANG:  Yeah.  And I want to be clear about

03:05:42 19    the press releases.  You know, this is some point that we

03:05:44 20    made in our brief.  I think it's an important one, but I

03:05:47 21    don't want to belabor it too much here.  The times when

03:05:52 22    Mr. Present did ask Ms. Radford for advice, first of all,

03:05:56 23    never involved the performance claims that are at the heart

03:05:59 24    of this lawsuit.  And the second, the comments that she made

03:06:03 25    on the things she did see make it very clear that the things

03:06:07  1    she said and the things she didn't see would not have passed

03:06:10  2    muster.

03:06:11  3           And let me give an example, because I used "things"

03:06:14  4    a lot, and that's not all that helpful.  She says in response

03:06:17  5    to the press releases, "There's a frequently sort of

03:06:20  6    recurring refrain.  Don't mix -- this makes it sound like

03:06:24  7    something people can invest in.  You're advertising an index.

03:06:29  8    Don't blur that line," essentially.  If you look at the

03:06:32  9    PowerPoint that Mr. Present put on the F-Squared website

03:06:38 10    starting on September 18, 2008, that didn't come down until

03:06:41 11    the SEC's investigation; if you look at the public comments

03:06:44 12    he made on Fox News, that are still available on the

03:06:48 13    Internet, that blurring is happening all over the place.

03:06:55 14           And you know, we didn't play the things for

03:06:58 15    Ms. Radford at her deposition that she hadn't heard, so I

03:07:01 16    can't say that there's any record of what she says about

03:07:04 17    that.  But I can say that when she looks at some of the

03:07:07 18    changes that were made to the disclosure language, she

03:07:13 19    says, "I don't know what that means.  I wouldn't have advised

03:07:16 20    on that.

03:07:17 21           One of the documents Mr. Fuller pointed you to

03:07:20 22    earlier, that letter to FINRA.  First of all, he said this

03:07:24 23    later, but I want to make sure the Court understands, the

03:07:26 24    date on that is October 12th.

03:07:28 25           THE COURT:  The date on the draft letter.

03:07:30  1         MS. HERSHFANG:  Of the letter.  It's an actual

03:07:32  2    letter, it's not a draft.  Her handwriting didn't go on a

03:07:32  3    draft.  Her handwriting went on the letter that had already

03:07:37  4    been sent to FINRA, because she was asked to look at it on

03:07:41  5    November 25, 2009.  The letter went to FINRA in October of

03:07:46  6    2009.  So it's not as if Mr. Present asked her for advice

03:07:51  7    before he sent that letter to FINRA.  At best, it's evidence

03:07:54  8    that he presented K&L Gates with a description of what he had

03:07:58  9    already told the regulator.

03:08:00 10         And there's a word, and she circles this on the

03:08:05 11    second page of that letter, the word "theoretical" shows up.

03:08:12 12    And Your Honor may or may not remember, because it's a pretty

03:08:15 13    dinky point, but one of the changes that Mr. Present made to

03:08:19 14    the disclosure language in response to FINRA's comments was

03:08:22 15    to change the word "hypothetical" to "theoretical."  And the

03:08:26 16    word "theoretical" is circled here on this page.

03:08:29 17         And I asked Ms. Radford, "Why did you circle that?"

03:08:31 18         "Oh, I don't remember if I circled it."

03:08:33 19         "Okay.  Do you have any idea why it was circled?"

03:08:36 20         "Well, yes, I would circle it today."

03:08:39 21         "Why is that?"

03:08:40 22         "Because I don't understand that word.  It doesn't

03:08:42 23    make any sense in a performance advertising context."

03:08:46 24         And Michael Caccese, the so-called guru of

03:08:49 25    performance advertising, said the same thing.

03:08:51 1          So the notion that somehow Mr. Present has some

03:08:54 2     good faith evidence to show, based on his dealing with these

03:08:59 3     attorneys who have testified that they didn't give this

03:09:02 4     advice and they don't know what this word means and they

03:09:04 5     wouldn't have allowed the kind of blurring that went on,

03:09:08 6     it's a little bit --

03:09:09 7          THE COURT:  They wouldn't have approved it.

03:09:11 8          MS. HERSHFANG:  That's right.  And it's a little

03:09:11 9     bit of a goose chase, Your Honor, because, as I've pointed

03:09:15 10    out before, it's, you know -- assume Mr. Present gets up and

03:09:19 11    says all the things he wants to say.  And I do want to

03:09:22 12    address, briefly, the sort of lawyers in the atmosphere

03:09:26 13    culture of compliance thing, but assume for the moment that

03:09:29 14    he testifies about recalling particular conversations and

03:09:32 15    getting particular advice.  Then what we need to do, because

03:09:36 16    these people don't seem to remember, is march through the

03:09:39 17    entire billing record and the entire documentary record to

03:09:43 18    show what the parties all now know is true, because we did

03:09:46 19    this already and the record is in front of the Court, that

03:09:48 20    there is no evidence that that advice was given.  And so it's

03:09:53 21    the longest impeachment.

03:09:55 22         THE COURT:  Other than his word.

03:09:56 23         MS. HERSHFANG:  Exactly.  It's the longest

03:09:59 24    impeachment you've ever seen.  I mean, it goes on for a week.

03:10:02 25    It's at the end of the trial, after he takes the stand in his

03:10:06  1   own defense.  It's the most boring five days any jury has

03:10:09  2   ever been asked to sit through.

03:10:10  3          Now, none of those are good reasons to keep it out,

03:10:14  4   if he has a right to bring it in, and I don't mean to imply

03:10:18  5   that.  But on this record, I don't think he has a right to

03:10:21  6   bring it in.

03:10:22  7          Before I sit down, I just do want to talk about --

03:10:24  8   I see this kind of in two pieces, and I think Your Honor's

03:10:27  9   questions went a little bit to that.  There's a question of

03:10:29 10   actual evidence, of actual advice of the actual statements

03:10:32 11   that are at issue in this case.  You've heard me on that.

03:10:35 12   The other piece is this, "We've hired a lot of lawyers, we've

03:10:39 13   paid them a lot of money.  There was a big, long bill.  You

03:10:43 14   know, I fostered a culture of compliance."  That part, I

03:10:48 15   think, can be seen differently.  And I think it really needs

03:10:51 16   to be excluded because of the kryptonite problem and

03:10:56 17   because --

03:10:56 18          THE COURT:  The general culture -- because it's not

03:10:58 19   relevant to this, because there's no evidence that that

03:11:01 20   advice or that effort related to this particular product or

03:11:04 21   these statements.

03:11:05 22          MS. HERSHFANG:  That's right, Your Honor.

03:11:06 23          And imagine for a moment -- I'm not saying it's

03:11:08 24   this case, but certainly there have been such cases.  Imagine

03:11:11 25   for a moment, someone who does all of that and then decides,

03:11:14  1   "Hey, I can steal from the company till, and nobody will

03:11:18  2   notice," and goes ahead and diverts funds from, you know --

03:11:23  3   corporate funds to his own, it's not relevant that in all

03:11:26  4   other aspects he retained and had lawyers around.  It

03:11:30  5   doesn't -- I mean, it's more like character evidence, which

03:11:33  6   is excluded.

03:11:36  7          THE COURT:  That's really an argument that, then --

03:11:40  8   that says anything that does come in, needs to be evidence

03:11:44  9   that relates to these -- either this index product or these

03:11:50 10   statements that are -- the ones that you challenge.

03:11:54 11          MS. HERSHFANG:  I think that's right.  And then I

03:11:56 12   don't know why that's not advice of counsel.

03:12:00 13          THE COURT:  Okay.

03:12:01 14          MR. FULLER:  Your Honor, can I address a couple of

03:12:03 15   things?

03:12:03 16          THE COURT:  Yeah.

03:12:04 17          MR. FULLER:  I mean, I have to tell you, when I --

03:12:08 18   when we got these documents after the waiver, where's the

03:12:10 19   e-mail that says, "You're doing something wrong," or

03:12:14 20   correcting it?  Where's the e-mail when Mr. Duggan e-mails

03:12:19 21   Mr. Caccese and says, "I got off the phone with Howard, and

03:12:21 22   he says Rebecca got this advice"?  That's Howard's state of

03:12:26 23   mind, Mr. Present's state of mind.  Where's the e-mail,

03:12:27 24   "That's insane, we would have never advised that," or, "Make

03:12:31 25   sure you straighten him out."  It's not there.

03:12:33  1          So we're putting -- sort of turning this on his

03:12:36  2     head, that the SEC thinks there's got to be an e-mail that

03:12:39  3     checks all these boxes, or a document that says client

03:12:42  4     disclosed X, client disclosed Y, advice is dispensed so --

03:12:46  5          THE COURT:  Well, I guess it raises the following.

03:12:49  6     The first question is:  Why is evidence that doesn't bear on

03:12:52  7     this product or these statements they challenge relevant?

03:12:54  8          MR. FULLER:  It bears directly on the product.

03:12:56  9     That e-mail from Duggan, they only --

03:12:58  10         THE COURT:  No.  Put that aside for a second.  But

03:13:01  11    taking it in layers.

03:13:02  12         MR. FULLER:  Okay.

03:13:03  13         THE COURT:  To the extent that you have evidence,

03:13:05  14    for example, that he paid lawyers a lot of money, okay.  And

03:13:08  15    some of that money related to -- AlphaCycle is the other

03:13:13  16    product, right?

03:13:15  17         MR. FULLER:  Yes.

03:13:16  18         THE COURT:  So AlphaCycle.  So maybe he paid a lot

03:13:20  19    of money on AlphaCycle.  Why is how much money and how often

03:13:20  20    he consulted with lawyers on AlphaCycle particularly

03:13:25  21    relevant, if the -- in other words, that doesn't relate to

03:13:29  22    this case, this product, these statements.

03:13:31  23         Now, it might be different if the SEC says -- if

03:13:36  24    they asserted their case, when they go first, that F-Squared

03:13:40  25    had a -- I was going to say "cowboy culture," but -- without

03:13:49 1    using that term pejoratively.  But if they had a culture that

03:13:54 2    essentially was to run roughshod on the rules, these were

03:13:56 3    people who -- you know, if they want to assert that part of

03:13:59 4    the reason you should -- the jury should infer bad faith

03:14:01 5    from, in Mr. Present, is because this was a company that, you

03:14:05 6    know, was cutting corners and had a culture of cutting

03:14:09 7    corners and brazenness in some way, then it seems to me, if

03:14:12 8    they do that, you get to respond not just on this product and

03:14:16 9    these things.

03:14:17 10           But if they confine themselves to this product and

03:14:21 11   these statements, which is what it sounds like they're doing,

03:14:24 12   or intending to do, then why is it relevant that as to other

03:14:28 13   products, why isn't -- why, in the first instance, wouldn't

03:14:32 14   it just be lawyer stuff, if it comes in, relates to these

03:14:35 15   products and these statements?

03:14:36 16           MR. FULLER:  Well, Your Honor, I don't know what

03:14:38 17   exactly they would try to do, but I have a -- a feeling, a

03:14:41 18   sense, based on experience, that most jurors coming into the

03:14:44 19   courthouse, when they see SEC versus an individual, envision

03:14:48 20   somebody operating out of a basement or *Wolf of Wall Street*

03:14:52 21   or that they're ripping people off in a Ponzi scheme of some

03:14:57 22   kind.  And so I don't think the average juror expects that

03:15:01 23   kind of defendant to have done these kind of things.

03:15:04 24           THE COURT:  Well, but nobody is saying that you

03:15:06 25   can't put in -- they're not moving at the moment to exclude,

03:15:10  1    and it's hard for me to imagine that it wouldn't come in,

03:15:12  2    some overview:  This was the size of the company, and this is

03:15:16  3    the context they worked in.  And there were different people.

03:15:16  4    And they're not even objecting that you can put in there was

03:15:19  5    a compliance officer.  And that there is this and that, and

03:15:22  6    this was the nature of the product.

03:15:23  7          And I imagine, to some extent out of your two

03:15:26  8    presentations, the jury is going to be -- it will be

03:15:29  9    explained to the jury, what is this index product.  You don't

03:15:32 10    invest directly in it, but how it's used to manage money.

03:15:35 11    And there may be evidence about how it grew.  And so a lot of

03:15:38 12    that context, that this isn't a boiler room in the basement.

03:15:42 13          MR. FULLER:  I would hope that would be how it

03:15:44 14    comes in.  But the way the complaint is alleged, it's pretty

03:15:47 15    dire.  So I don't know -- to answer your question, Your

03:15:50 16    Honor, if it comes in like that, I agree, there's really not

03:15:53 17    a -- it's not that necessary to get -- and what I really care

03:15:58 18    about is the fact that he consulted lawyers on the specific

03:16:00 19    issues, because I disagree completely with Ms. Hershfang that

03:16:05 20    there's no record evidence that he did.  And I can point to

03:16:08 21    some of that.  And I would like to.  Because I want to make

03:16:10 22    sure we leave here today, Your Honor, with you understanding

03:16:15 23    the basis for what we're arguing here.

03:16:17 24          THE COURT:  So as to these statements and as to the

03:16:21 25    statements that they challenge or the product they challenge,

03:16:26  1   what is the -- one piece of evidence you have that he

03:16:29  2   received advice about being able to say what he said about

03:16:35  3   what happened between 2001 and 2008 is he says, "They told me

03:16:40  4   these things," right?  That's one piece.  Not the only piece,

03:16:43  5   but that's one piece.

03:16:44  6             Is that fair?

03:16:45  7             MR. FULLER:  That's one piece, yes.

03:16:46  8             THE COURT:  So he's -- one piece you anticipate is

03:16:48  9   he's going to get on the witness stand and say, "I talked to

03:16:52 10   my lawyers.  I talked to this person, who was a lawyer.  I

03:16:55 11   paid them.  This is what I asked them, and this is what they

03:16:58 12   told me," or, "this is what I told them."

03:17:00 13             MR. FULLER:  "I told them I was doing this.  This

03:17:03 14   is what I told everybody that what I was doing."  "And the

03:17:06 15   lawyers, you told them."  That's one piece.

03:17:08 16             The evidence I showed you, that letter that Mrs.

03:17:09 17   Hershfang points out the lawyer didn't review it ahead of

03:17:11 18   time, that's fine.  They can bring that out.  But the point

03:17:14 19   is, his understanding of what Morton did is in that letter,

03:17:17 20   and it's in the hands of K&L Gates for four hours.  And they

03:17:22 21   emerge from that meeting, and it's full steam ahead.

03:17:25 22             And I would like to show you, Your Honor, some

03:17:28 23   other of the evidence -- so may I use the Elmo one more time?

03:17:31 24             THE COURT:  Sure, go ahead.

03:17:32 25             MR. FULLER:  At the risk of -- and by the way, the

03:17:39  1    other -- I mean, Ms. Hershfang, I think maybe overstates a

03:17:41  2    little, because we're all lawyers and we like to think we're

03:17:41  3    smart and important.  But Mr. Present is not a lawyer,

03:17:45  4    either.  And so he's more like the juror, who -- I mean,

03:17:46  5    that's another point here, that he went to the lawyers

03:17:49  6    because he doesn't understand performance rules of Clover

03:17:53  7    Capital Management and these other no-action letters.  So I

03:17:57  8    mean, again, that's -- it's sort of a reason why the evidence

03:17:59  9    should come in.

03:18:00  10          THE COURT:  I'll let you go to the Elmo.  But here

03:18:01  11   is one of the things that I'm struggling with, Mr. Fuller.

03:18:04  12   There is a thing clearly that's an advice of counsel defense.

03:18:08  13   And there's clearly prerequisites to that.  And you clearly

03:18:12  14   aren't seeking to invoke that formal advice of counsel

03:18:15  15   defense.  You've said in our opposition, "We're not doing

03:18:18  16   that.  We disclaim the affirmative defense."  You are -- you

03:18:22  17   might not be like the K&L Gates lawyer, who's a guru of

03:18:28  18   performance analysis, but you're a skilled and experienced

03:18:33  19   lawyer who's tried cases and is familiar with the kinds of

03:18:36  20   issues that we're dealing with here.  And so you saying that,

03:18:41  21   that is your intent, that's fine.  I accept that.

03:18:44  22          But so that's -- I understand you, from the get-go,

03:18:48  23   to forthrightly be saying, "Judge, I'm doing something a

03:18:53  24   little different."  You cite Judge Saylor's decision in

03:18:53  25   *Gorski,* and you say, look where he distinguishes the two or

03:18:53  1   advice to counsel and sort of other things offered for good

03:18:53  2   faith.

03:19:00  3          So let's suppose I were to agree with you.  I'm not

03:19:05  4   saying I do, but let's say I agree with you and I let you put

03:19:07  5   in the kinds of things that you want to put in about, for the

03:19:11  6   moment just say evidence about these statements or this

03:19:17  7   product.  So your client to testify, "This is what they" --

03:19:18  8   "I told them this, they told me that," or other evidence that

03:19:22  9   you're going to show me in a second, but what do I tell the

03:19:26 10   jury, if anything, about this?  And how would it differ from

03:19:28 11   what I would tell the jury, if anything, about if you were

03:19:31 12   making an advice of counsel defense?

03:19:33 13          MR. FULLER:  I think one is sort of a mandatory.

03:19:36 14   What I envision, Your Honor, is an instruction that says

03:19:39 15   something like:  In the context of good faith, you can

03:19:42 16   consider evidence that Mr. Present consulted attorneys about

03:19:48 17   this; that he sought advice and that he -- you know,

03:19:53 18   something along those lines that would be similar to an

03:19:56 19   advice of counsel instruction.

03:19:58 20          THE COURT:  In other words:  If you jurors believe

03:20:00 21   that he consulted with lawyers -- that part is probably less

03:20:03 22   in dispute because of all these billing records.  But if you

03:20:07 23   believe that he said the things he said he said -- and I'm

03:20:10 24   not saying this would be the instruction, but this is what

03:20:14 25   you expect the juror -- the thought process that the juror

03:20:16   1   would go through.  But if you believe the things that he says

03:20:19   2   he said, if you believe the things he says the lawyers said

03:20:22   3   back to him, if you believe those things happened, then you

03:20:26   4   can evaluate those things in the context of what the lawyers

03:20:29   5   say they would or wouldn't have done or did or didn't do, or

03:20:33   6   what they knew or didn't know, or the amount of advice they

03:20:37   7   were asked to give and the amount of time they spent looking

03:20:39   8   into it, or what other factors might be relevant, and decide

03:20:43   9   what weight to give it and evaluate whether he had good faith

03:20:45  10   or not.  And you can consider it and decide it.

03:20:48  11            That's essentially what you're talking about.

03:20:49  12            MR. FULLER:  Yes, Your Honor.

03:20:50  13            THE COURT:  You might not want it put that way.

03:20:53  14            MR. FULLER:  I don't think I would put it that way,

03:20:55  15   as you state it.  But generally, it would be you should

03:20:59  16   consider whether -- as I understand it --

03:20:59  17            THE COURT:  Is there anything about the thought

03:21:01  18   process, that's the analytic process they would have to go

03:21:05  19   through, however it was explained to them?

03:21:07  20            MR. FULLER:  Yes.  And that it's a part of -- and

03:21:08  21   that's a defense to scienter and to negligence, and so that's

03:21:12  22   why -- the instruction would be going to that.  As you are

03:21:15  23   going to --

03:21:15  24            THE COURT:  Is it really a defense, or is it really

03:21:17  25   just --

03:21:17  1          MR. FULLER:  It rebuts -- well, it's not a defense;

03:21:20  2     that's the wrong word.  It counteracts.  Or it's evidence of

03:21:23  3     lack of scienter or evidence of good faith that he exercised

03:21:27  4     due care.  So we're going to be asking for an instruction on

03:21:31  5     due care, which this would be evidence supporting that.

03:21:34  6          Now, under the advice of counsel, you would be able

03:21:37  7     to say you -- it's a bar of the claim, if we had -- I mean,

03:21:40  8     the problem, we don't have a concise --

03:21:43  9          THE COURT:  If you had an advice of counsel, the

03:21:44 10     formal advice of counsel defense.  If the jury found that he

03:21:48 11     consulted with a lawyer, that the lawyer told him what he

03:21:51 12     said they told him and he had made full disclosure, would I

03:21:54 13     have to tell the jury that's it then he gets good faith and

03:21:58 14     you --

03:21:59 15          MR. FULLER:  I think that is how it works.  I think

03:22:02 16     that --

03:22:02 17          THE COURT:  So here you're -- what you're saying is

03:22:05 18     different is that it's not -- that it's just a -- it's just a

03:22:09 19     fact that goes in the mix.

03:22:10 20          MR. FULLER:  Of good faith.  That's how I read the

03:22:13 21     *Gorski* case.  That's how I read that *SEC* case I cited, that

03:22:18 22     it goes into the bag of good faith.  That's how it happened

03:22:22 23     in criminal cases, as well.  So again, I don't --

03:22:26 24          THE COURT:  But this isn't a criminal case.

03:22:28 25          MR. FULLER:  Absolutely not.  And -- but the

03:22:29 1   concept is similar in that you have to show, prove *mens rea*,

03:22:34 2   and here this is evidence that proves *mens* -- is establishing

03:22:39 3   defendant's *mens rea* is that of due care and good faith.

03:22:43 4        THE COURT:  So what is this other evidence?

03:22:45 5        MR. FULLER:  So this is just an example.  So the

03:22:47 6   marketing review --

03:22:48 7        And by the way, Judge, Deb Deskavich and --

03:22:55 8   Mr. Present isn't the only one who said he consulted lawyers

03:22:59 9   on this product.  Ms. Deskavich, who was the prior compliance

03:23:02 10  officer, forwards -- and this is May.  I think the same day

03:23:06 11  as that phone call, these are the things -- this is the

03:23:08 12  product that is at issue.

03:23:08 13       THE COURT:  What does it mean there's no -- in

03:23:11 14  particular, one, "No backtested data in this index"?

03:23:14 15       MR. FULLER:  That is the live track record that was

03:23:16 16  discussed in the Virtus letter.  That's exactly the product

03:23:20 17  at issue.  And there's no limitation on what they're supposed

03:23:23 18  to review.  They're supposed to review it.  So that's one

03:23:28 19  example.

03:23:28 20       THE COURT:  So there -- so right there, you're

03:23:30 21  saying what that is is this person, Deb Deskavich at F-2,

03:23:38 22  sending two -- in 2011, sending to Duggan this presentation,

03:23:44 23  and with the exception date of 4/2001.  And by saying there

03:23:49 24  is no backtested data in this index, what she's meaning to be

03:23:52 25  conveying is that all of the data there is live data,

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 03:23:57 | 1  | starting in April of 2001.                                   |
| 03:23:59 | 2  | MR. FULLER:  Based on, yes.                                  |
| 03:24:01 | 3  | THE COURT:  And the live data prior to.                      |
| 03:24:03 | 4  | MR. FULLER:  '06 -- well, '08 in this case, but the          |
| 03:24:08 | 5  | company was founded in '06.                                  |
| 03:24:10 | 6  | THE COURT:  Right.  So the live data, back in the            |
| 03:24:12 | 7  | early period, is whatever Morton presumably reported about.  |
| 03:24:18 | 8  | MR. FULLER:  Yes.                                            |
| 03:24:19 | 9  | THE COURT:  The returns.                                     |
| 03:24:20 | 10 | MR. FULLER:  Right.  And then the next one --                |
| 03:24:22 | 11 | THE COURT:  So this is reporting returns, though,            |
| 03:24:24 | 12 | right?                                                        |
| 03:24:25 | 13 | MR. FULLER:  Yes.                                            |
| 03:24:25 | 14 | THE COURT:  Of how well it did.                              |
| 03:24:27 | 15 | MR. FULLER:  Yes.                                            |
| 03:24:27 | 16 | THE COURT:  So where -- what's the -- I know                 |
| 03:24:29 | 17 | there's evidence of the amount that was managed, which one   |
| 03:24:34 | 18 | piece of evidence of that is the handwritten piece of paper. |
| 03:24:37 | 19 | But where is the evidence about returns?                     |
| 03:24:40 | 20 | MR. FULLER:  Mr. -- that was what was built out              |
| 03:24:42 | 21 | over the summer, when they created the index.  That's what   |
| 03:24:46 | 22 | F-Squared built out.                                         |
| 03:24:47 | 23 | THE COURT:  Well, but what's the evidence of live            |
| 03:24:49 | 24 | data returns?                                                 |
| 03:24:50 | 25 | MR. FULLER:  The actual signals were sent and                |

03:24:53   1    represented to have been used live, to Mr. Present.

03:24:56   2            THE COURT:  The signals -- so wait, the signals --

03:24:58   3    the data input, which is the --

03:25:00   4            MR. FULLER:  Plus and minus.

03:25:01   5            THE COURT:  The plus -- there's the data input,

03:25:03   6    which is what did these sector of funds do on a given day, if

03:25:07   7    you're looking at the day.  But what's the evidence that they

03:25:09   8    did it by the day and that they then traded in a certain way,

03:25:15   9    based on that?

03:25:16  10            MR. FULLER:  Well, Judge, now we're talking about a

03:25:18  11    number of e-mails -- it's Mr. Present's testimony and a

03:25:21  12    number of e-mails that were exchanged in that summer.  I

03:25:24  13    mean, I have them with me, I can show you --

03:25:26  14            THE COURT:  No, I remember those e-mails.  But

03:25:28  15    that's what that is.

03:25:29  16            MR. FULLER:  That's that evidence.  Yeah.  And it's

03:25:30  17    the fact that he got signals and various representations from

03:25:34  18    Corey Hoffstein at the time, "Before I started systemizing,

03:25:37  19    Morton told me this."

03:25:39  20            I mean, the other thing that the Court needs to be

03:25:40  21    aware of, Morton's office was in the same building and there

03:25:44  22    was a lot of discussions back and forth, face to face, and

03:25:47  23    this isn't simply, you know, one phone call.  There was close

03:25:51  24    coordination.  So I mean, it's hard for you to understand

03:25:54  25    that from the bench in these tidbits of hearings, but that's

03:25:59  1    going to come out at trial.  But the other --

03:26:01  2             Let me just show you, Your Honor, if I might --

03:26:04  3             THE COURT:  Go ahead -- well, wait.  So she sent

03:26:07  4    this, asking for review in 2011.  So you would say this is

03:26:11  5    evidence of seeking legal advice, regarding these things in

03:26:15  6    May of 2011, the documents that were attached?

03:26:18  7             MR. FULLER:  That's one example of it, yes, Your

03:26:20  8    Honor.

03:26:20  9             THE COURT:  All right.  What's the evidence of

03:26:21  10   advice coming -- where -- the advice coming back?  How is

03:26:25  11   that going to come into evidence?

03:26:28  12            MR. FULLER:  Testimony -- Deb Deskavich will

03:26:30  13   testify that she remembers this marketing review.  She had a

03:26:34  14   phone call.  She doesn't remember the -- she doesn't remember

03:26:37  15   what was said, again, but she remembers -- she can say, "We

03:26:41  16   did what the lawyers told us to do."

03:26:43  17            Now, Ms. Hershfang has stated, and they put it in

03:26:46  18   their brief, "Well, they said it looks like -- your ads look

03:26:49  19   like you're managing money.  Make sure you're being clear

03:26:52  20   about that."  I'm not going to dispute that, but that's not

03:26:54  21   in the complaint.  That's not what this case is about.  And

03:26:57  22   they knew this was an index company, that they weren't taking

03:27:00  23   people's money to manage it.  And if the SEC had brought a

03:27:03  24   case on you misrepresented you were managing money and you

03:27:06  25   weren't, then -- but that's not what the case is about.

03:27:08    1        So they want to point to that to say the company

03:27:11    2    rejected advice.  But that's not the case, Your Honor.

03:27:13    3    There's no evidence that they rejected any advice about

03:27:16    4    advertising the track record or -- none of the lawyers

03:27:19    5    remember it, and that's something, as a lawyer, you would

03:27:22    6    remember, I believe.  And maybe you'd make a memo that says,

03:27:25    7    "I told him to do this and he didn't do it."  Maybe you did

03:27:29    8    that in your prior life in the defender's office.  I don't

03:27:31    9    know.

03:27:32   10        So Your Honor, if I can show you the bill -- so

03:27:46   11    Ms. Hershfang says there's no evidence that they talked about

03:27:48   12    the new product in that one hour or what portion of it.  It

03:27:52   13    says right there, "Call with Howard Present regarding new

03:27:57   14    products."  The only new product at that time was

03:28:01   15    AlphaSector.  That's the product in September of 2010.  So

03:28:05   16    that's just corroborating Mr. Present's --

03:28:07   17        THE COURT:  This case seems to be about whether it

03:28:10   18    was permissible for Mr. Howard and F-Squared to say what

03:28:16   19    seemingly, indisputably they did say about the track record

03:28:23   20    back to 2001.  Going back, say, for example, to your 2011

03:28:30   21    e-mail.

03:28:30   22        MR. FULLER:  I'm going to get to that.  I'm just

03:28:32   23    laying out for you the other -- in the bills where it

03:28:33   24    reflects actual advice given, because I thought you would --

03:28:37   25        THE COURT:  Yes.  Okay.  I see.

03:28:38 1      MR. FULLER:  So now we have in December, "review

03:28:40 2 advertisement materials," .10, at a hefty $800 an hour.  It's

03:28:48 3 an expensive tenth of an hour.  And then there's a call with

03:28:53 4 Mr. Present, "review advertising materials."  This is the

03:28:56 5 review of that letter I pointed out to you.  That's billed

03:28:58 6 here and paid for.

03:28:59 7      THE COURT:  Sure.  But what's the significance of

03:29:01 8 the review after you sent it?  It makes no sense.  I mean,

03:29:02 9 it's kind of like somebody hires you after they rob the bank,

03:29:05 10 so to speak, and they say, "Should I have done it?"  And you

03:29:08 11 might tell them, "That was a bad idea," but that advice

03:29:12 12 doesn't have any bearing on their --

03:29:14 13      MR. FULLER:  Well, it certainly does, Your Honor.

03:29:16 14 This is before the product has really taken off.

03:29:18 15      THE COURT:  But how about -- but there's -- but

03:29:21 16 it's after they made the statement.

03:29:22 17      MR. FULLER:  Well, then he should have said --

03:29:25 18 there should have been some document that says, "This is

03:29:28 19 incorrect."  Or you should've -- the fact that he sent it

03:29:29 20 before showing it to the lawyers shouldn't preclude him

03:29:32 21 offering it.  They can point that out in cross and say,

03:29:36 22 "Well, he didn't -- you did this before you showed the

03:29:39 23 lawyers."  I mean, that goes to the weight, and the jury can

03:29:41 24 decide.  He did that to be --

03:29:41 25      It's not like a bank robbery.  This is his

03:29:44  1    statement of facts that he understood how this product was

03:29:46  2    used, and they're trying to get it to market.  So it's not at

03:29:49  3    all like the scenario you just described.  This is --

03:29:54  4            THE COURT:  So this is like the person who went to

03:29:57  5    the bank and did what they did and came to the lawyer and

03:29:58  6    then said, "This is what I did the other day, can I keep

03:30:00  7    doing that?"

03:30:03  8            MR. FULLER:  Well, I would take the bank out of the

03:30:05  9    analogy.  I'd use this and I'd say, "This is what I'm doing.

03:30:08 10    This is what I've told Virtus, so they can get this through

03:30:14 11    FINRA.  Can you help me get through FINRA?"  And this --

03:30:17 12    that's what he -- he's paying for them to help.

03:30:17 13            THE COURT:  But how are they to know,

03:30:20 14    fundamentally, the lawyers, that what he did or didn't know

03:30:23 15    about and how he acquired that information, the depth of that

03:30:28 16    information, and how he acquired it, about the trading that

03:30:33 17    happened -- whatever trading that happened before?

03:30:36 18            MR. FULLER:  Well, again, Mr. Present would testify

03:30:39 19    that he discussed the fact that this was -- well, first of

03:30:43 20    all, it's in the letter.  A lot of it is in the details in

03:30:49 21    the letter itself.  But he had discussed this with

03:30:52 22    Ms. Radford.  That's his memory.

03:30:55 23            THE COURT:  But like the largely unchanged.

03:30:57 24            MR. FULLER:  The statement that it was largely

03:31:00 25    unchanged?

03:31:01  1          THE COURT:  The engines, over that period.

03:31:04  2          MR. FULLER:  He discussed that with her.  His

03:31:06  3  testimony was that he discussed that with her specifically.

03:31:08  4          THE COURT:  Discussed -- saying, telling her that

03:31:10  5  it was largely unchanged.

03:31:11  6          MR. FULLER:  No.  That it was the 40 -- the 60 and

03:31:15  7  the 40 and then this other one.  And that his memory is that

03:31:18  8  she said it's okay to describe it in that certain way.

03:31:21  9  That's, I believe, the testimony that's in the record that we

03:31:23 10  have before you.

03:31:24 11          THE COURT:  All right.

03:31:25 12          MR. FULLER:  And so there's that.  And then the

03:31:29 13  next day, there's more on the Virtus call, another hour or

03:31:33 14  so.  And then we get to the -- now they're reviewing the

03:31:41 15  actual marketing material, and there's a number of entries

03:31:48 16  here.  Doug Charton reviews all this, telephone call.  If you

03:31:54 17  look in the middle there, "review marketing materials,"

03:31:57 18  review -- there's a lot of -- "view SEC mock audit report."

03:32:01 19          I mean, that's the other piece of this, Your Honor,

03:32:03 20  that I haven't gotten into.  He also utilized another expert

03:32:09 21  in the field named Doug MacLean, who ran Armor Compliance.

03:32:10 22          THE COURT:  And they're not objecting to that, I

03:32:10 23  don't think.

03:32:13 24          Is that right?

03:32:13 25          MS. HERSHFANG:  That's right, Your Honor.

03:32:14 1          MR. FULLER:  And that's because the company did not

03:32:16 2     claim privilege over that mock audit during the

03:32:18 3     investigation, as I understand it.  And so that mock audit

03:32:20 4     comes out in the course of the investigation.  And frankly,

03:32:24 5     it's in the complaint.  It's referenced in the complaint as,

03:32:28 6     you know, Mr. Present apparently didn't do enough after he

03:32:32 7     received information in the mock audit that said you should

03:32:35 8     have -- you should have records to support performance prior

03:32:39 9     to '06.  And we put in our papers -- Ms. Fishman will testify

03:32:44 10    at trial, spoke to Doug MacLean, who told him it wasn't a

03:32:50 11    matter of great concern, and he reported that to the board.

03:32:52 12         So the mock audit, you know, they want to use it as

03:32:54 13    a sword.  I would argue it's, again, evidence of his good

03:32:58 14    faith.  Because why do you hire -- and he did that in 2010,

03:33:01 15    as well.  So the mock audit gets sent to K&L Gates.  It's an

03:33:06 16    open book.  And so you ask him, "Well, what's the evidence

03:33:09 17    they told him these things?"  I mean, they opened up their

03:33:12 18    files.  They gave him Doug MacLean's mock audit.

03:33:17 19         Doug MacLean testified -- and he is deceased now,

03:33:19 20    but he testified in deposition, and the evidence shows he

03:33:21 21    went in there and looked at all the records.  And he was

03:33:23 22    fully aware of the wealth manager, of the fact that F-Squared

03:33:26 23    claimed that he had used this --

03:33:26 24         THE COURT:  Is he a video depo or a --

03:33:28 25         MR. FULLER:  No, it's a --

03:33:31  1          So that's another piece of this that's not an issue

03:33:34  2     right now.  But -- so it's not just K&L Gates.  He hired

03:33:38  3     Armor Compliance to do, essentially, almost a duplicative

03:33:42  4     function.

03:33:42  5          And then we have these bills that you can look at.

03:33:45  6     And I won't belabor it, but there's more -- you know, those

03:33:47  7     are the total hours.  So there's concrete evidence that

03:34:02  8     Mr. Present directed people at F-Squared to have K&L Gates

03:34:07  9     review marketing materials on this very issue and that he

03:34:10 10     engaged or authorized Deb Deskavich to engage Armor

03:34:14 11     Compliance.  She's the one who dealt with them.  So it's not

03:34:18 12     even Mr. Present dealing with the lawyers, it's other people

03:34:21 13     who also understood that they didn't have the trade blotters,

03:34:24 14     who also understood that this was based on representations

03:34:27 15     from Mr. Morton.

03:34:28 16          And so all of it, again, goes into the mix of good

03:34:32 17     faith and the fact that he acted reasonably.  And that's

03:34:36 18     central, central to his defense here.  And so to keep it out,

03:34:41 19     because there's not some concrete, written, etched-in-stone

03:34:47 20     evidence that he got advice that he could do exactly what he

03:34:50 21     was doing would be completely unfair, Your Honor, and not

03:34:53 22     reflective of what actually happened, which is what I think

03:34:57 23     we want to have presented in front of the jury.

03:34:59 24          THE COURT:  Okay.  Anything else from the SEC?

03:35:02 25          MS. HERSHFANG:  If you -- begging Your Honor's

03:35:04   1    indulgence.

03:35:04   2             THE COURT:  Sure.

03:35:05   3             MS. HERSHFANG:  First, a quick note on the stuff

03:35:08   4    that's not in the complaint.  I want to be very clear that

03:35:11   5    the SEC has sued Mr. Present for fraud related to false

03:35:16   6    advertising and that this is all false advertising.  So it is

03:35:20   7    certainly part of our case, and it will be part of our case

03:35:22   8    when we present our case to the jury.

03:35:24   9             I also --

03:35:25  10             THE COURT:  Which will be part of your case?

03:35:28  11             MS. HERSHFANG:  I'm sorry?

03:35:29  12             THE COURT:  Which thing will be part of your case?

03:35:32  13             MR. HUNTINGTON:  These PowerPoints.  I mean, this

03:35:35  14    advertising material, you know, the PowerPoints, the public

03:35:38  15    statements, many which actually are in the complaint.

03:35:40  16             THE COURT:  I thought what he meant about that was

03:35:42  17    that you're not -- and maybe you are, maybe you aren't, I'm

03:35:45  18    not sure.  I thought what he was saying is you're not

03:35:48  19    claiming that the fraud was suggesting to people that the

03:35:51  20    index is something that you can invest in, which it's not

03:35:55  21    something that you can invest.

03:35:57  22             MS. HERSHFANG:  Well, it is part of the fraud, Your

03:35:59  23    Honor.  I mean, it is what I think of as the blurring.  It's

03:36:02  24    what makes the advertisements deceptive.  You know, an index,

03:36:06  25    we all know, the jury will know eventually, is not something

03:36:07  1     that you can invest in.  If you look at the marketing

03:36:10  2     materials, it talks about, "We saved our clients"; it talks

03:36:13  3     about, you know, "We were up X over the S&P."  So the

03:36:18  4     language that's in there is language that is deceptive.  I

03:36:25  5     would --

03:36:25  6              THE COURT:  So part of the fraud is this blurring,

03:36:28  7     it's not just the assertion that there was live data.

03:36:31  8              MS. HERSHFANG:  That's right.

03:36:32  9              THE COURT:  Part of your claim is he's -- in a

03:36:36 10     simplified form, he says it was live -- it was used to manage

03:36:39 11     live assets from 2000 to 2008, and it wasn't -- were not in

03:36:44 12     sufficiently similar form to make the statements that he did

03:36:47 13     on the disclosures he made.  And part of it is that he was

03:36:51 14     suggesting to people that they were -- we were managing

03:36:54 15     money, when you weren't.  You were creating an index.

03:36:57 16              MS. HERSHFANG:  That's right.

03:36:58 17              THE COURT:  And there's a blurring without a

03:37:00 18     careful monitoring of the lines between saying that the index

03:37:03 19     didn't dip the way the S&P 500 dipped, because the index, if

03:37:08 20     you followed it, would push you to cash, or what have you.

03:37:11 21              MS. HERSHFANG:  That's right, Your Honor.

03:37:12 22              THE COURT:  I see.  Go ahead.

03:37:16 23              MS. HERSHFANG:  The billing records that Mr. Fuller

03:37:19 24     just showed you indisputably show many moments of Mr. Present

03:37:26 25     being billed for reviews.  They don't show any advice.  And

03:37:30 1    the record shows that actually there's no record of advice

03:37:34 2    having been given.  And that's important here.  The

03:37:37 3    relationship with K&L Gates terminated without there being

03:37:41 4    any record of their having advised Mr. Present about -- on

03:37:46 5    this, you know, purported in-depth review of the marketing

03:37:49 6    materials.  So --

03:37:50 7            THE COURT:  In response to Deskavich's --

03:37:53 8            MS. HERSHFANG:  That's right.  And on -- it's

03:37:57 9    actually *Deskavich*, which I've had to train myself very hard

03:38:02 10   to say.

03:38:03 11           But on that cover note, Your Honor put your finger

03:38:09 12   right on the thing, which is what does this mean that it's

03:38:11 13   not backtested back to April of 2001?  And Mr. Fuller said,

03:38:15 14   "Well, it was built-out in the summer of 2008."  Built-out

03:38:19 15   means backtested.  Mr. Present directed an analyst at his

03:38:27 16   firm, Juan Vargas, to do iterative backtests during the

03:38:33 17   summer of 2008, and it is undisputed that that is the process

03:38:37 18   that created the record that F-Squared advertised.  I want to

03:38:42 19   be very clear about that.

03:38:42 20           I think the Morton thing is a bit of a red herring.

03:38:45 21   I'm not quite sure why we keep talking about Mr. Morton here.

03:38:48 22   He's not a lawyer.  I don't understand Mr. Present to be

03:38:49 23   claiming that he relied on any advice from Mr. Morton.  And

03:38:56 24   when it comes to Mr. Morton, Mr. Present has been quite

03:38:57 25   clear, and this is both in his deposition and in the SEC's

03:39:00  1    brief, that there were a lot of things that he didn't know

03:39:03  2    about Mr. Morton's purported strategy, and therefore, by

03:39:07  3    definition, didn't tell his lawyers.  And this is at pages 4

03:39:10  4    and the top of 5 of our brief.

03:39:13  5         But they include things like he didn't know whether

03:39:13  6    Mr. Morton had discretion to trade in his client's accounts.

03:39:20  7    He didn't know how Mr. Morton actually traded his client

03:39:22  8    accounts pursuant to the strategy.  He never asked to see a

03:39:26  9    trade blotter, as we've discussed today, or any other kind of

03:39:30 10    evidence.  And so a notion that somehow he would have

03:39:32 11    disclosed these -- you know, that he could have made full

03:39:35 12    disclosure to his lawyers, well, he couldn't, because he's

03:39:37 13    admitted he didn't know all of this stuff.  And he didn't

03:39:40 14    know it because he didn't pursue it.  And that's obviously

03:39:43 15    going to be a big part of the case.  Is that his fault?  Is

03:39:47 16    that Mr. Morton's fault?  Is that some combination?  But it

03:39:51 17    has nothing to do with the lawyers.

03:39:52 18         On the new product question on whether there was a

03:39:58 19    new -- any other new product on September 10, 2008, I would

03:40:03 20    point the Court to Ms. Siegfried's testimony, which is

03:40:09 21    at tab --

03:40:09 22         THE COURT:  What's her role?

03:40:11 23         MS. HERSHFANG:  She was one of the few -- the

03:40:13 24    handful of early employees on --

03:40:15 25         THE COURT:  At F-2.

03:40:17  1        MS. HERSHFANG:  Yes.  I honestly don't know exactly

03:40:20  2   what her role was.  They were all kind of utility players, I

03:40:24  3   think, at the time.  But she has asked about the e-mails that

03:40:29  4   go along with that call that she had on September 10th.

03:40:32  5        So Rebecca Radford, as Your Honor will remember,

03:40:36  6   had two calls.  And what she says about the call is:  This is

03:40:40  7   relating to the AlphaCycle product, and my general

03:40:40  8   understanding of it was that the original model was

03:40:49  9   replicating something, a portfolio.  And let's just say it

03:40:56  10  had a thousand securities, and as he revised his math or

03:40:56  11  model or algorithm, or whatever you want to call it, he could

03:40:56  12  get satisfactory results with fewer and fewer securities.

03:41:01  13       So he was working on the AlphaCycle product.

03:41:05  14       So -- and she goes on to talk -- and I won't

03:41:09  15  belabor it.  But there's a new AlphaCycle product in

03:41:12  16  development and that's what the e-mail is about that goes

03:41:14  17  along with this call.  Presumably, it's what, at least, her

03:41:17  18  call is about.

03:41:19  19       Now, I understand that doesn't speak to

03:41:21  20  Mr. Present's call at all, but I did want to make clear to

03:41:24  21  the Court that AlphaSector was not the only new product in

03:41:28  22  development at the time.

03:41:28  23       The last thing that I want to say has to do with

03:41:30  24  the advice-of-counsel-like cases, and I have been remiss in

03:41:35  25  not addressing them yet today.  I think there -- they're, I

03:41:40   1   think, maybe just two cited and/or three, I guess, cited in

03:41:45   2   Mr. Present's opposition.  And the four that really, I think,

03:41:49   3   are the big ones, obviously, there's *Gorski*, which is Judge

03:41:56   4   Saylor's decision out of this district.  That case could not

03:41:57   5   be more different than this case.

03:41:59   6       Mr. *Gorski* sought advice from Mintz Levin and

03:42:04   7   followed it, and then got indicted for doing that.  And then

03:42:07   8   because of the what seems like a real procedural kerfuffle,

03:42:11   9   he wanted to keep Mintz Levin as his defense lawyers in his

03:42:15  10   criminal case, and part and parcel of that was that he had to

03:42:20  11   waive an advice of counsel defense.  Now, I'm not really sure

03:42:24  12   why it all happened.  And the magistrate judge session, even

03:42:29  13   though there are references in the docket to a written

03:42:33  14   opinion on it by the magistrate judge, I don't actually see

03:42:36  15   it in the docket.

03:42:37  16       But so here's a guy who has -- because of the

03:42:40  17   lawyer he's chosen, has been forced to waive what seems like

03:42:43  18   a pretty great defense under those circumstances.  It is not

03:42:48  19   at all surprising to me that faced with that procedural

03:42:50  20   posture, Judge Saylor cast about for some way to allow this

03:42:55  21   man to present his defense.

03:42:56  22       That's not Mr. Present.

03:42:59  23       The *Howard* case involved an executive at a firm who

03:43:04  24   signed a filing, after being informed that the attorneys had

03:43:09  25   reviewed it and approved it, the board had reviewed it and

03:43:13  1    approved it.  He had no part in communicating with the

03:43:17  2    attorneys.  He had no part in writing the filing.  He was

03:43:20  3    actually on vacation at the time he signed.  And because he

03:43:24  4    didn't have the direct dealings with the lawyers, the

03:43:27  5    procedural posture is a little weird there, too.  It was an

03:43:30  6    appeal to the D.C. Circuit from a decision from the

03:43:33  7    Commission on Appeals from an administrative law judge.  But

03:43:37  8    you know, because there was something technically faulty in

03:43:41  9    his advice of counsel defense --

03:43:43  10          THE COURT:  You mean, he hasn't made any disclosure

03:43:45  11   to the lawyers, because he had never talked to him?

03:43:49  12          MR. HERSHFANG:  Possibly.  I don't know what it

03:43:50  13   was.  But he failed to check some box, and the D.C. Circuit

03:43:54  14   said, you know, "This is ridiculous.  Just because he can't

03:43:57  15   check this box doesn't mean he can't assert the defense."

03:44:02  16   Having done that, they then go on to evaluate his evidence

03:44:06  17   using the advice of counsel framework, because there is no

03:44:08  18   other way to look at it.

03:44:10  19          There's a third case out of the Northern District

03:44:13  20   of Illinois, called *Ferrone* or *"Ferrone,"* and that also is

03:44:17  21   not this case.  It comes up on a motion in limine, and it's

03:44:21  22   denied without prejudice.  The judge basically says, "I don't

03:44:25  23   know" -- it's kind of a question Your Honor asked this

03:44:27  24   morning.  "I don't know what evidence Mr. Ferrone is trying

03:44:31  25   to put on here, so I can't exclude it."  And there the

03:44:36  1    defendant, who was the CEO of his firm, also had not dealt

03:44:40  2    directly with counsel.  So there was a little bit of, I acted

03:44:44  3    in good faith because I understood that counsel had reviewed

03:44:47  4    this, it was part of our process, that kind of argument.

03:44:52  5              None of that is this.

03:44:54  6              This is a defendant who, by his own admission --

03:44:57  7    I'm reading from the -- Mr. Present's opposition now.  In

03:45:01  8    these early years, Mr. Present was a primary contact between

03:45:04  9    F-Squared and legal counsel.  He authorized the hiring of law

03:45:08  10   firms, signed engagement letters, and had frequent direct and

03:45:12  11   indirect communication with attorneys.  Billing records,

03:45:15  12   e-mails and trial testimony will show Mr. Present's continual

03:45:19  13   involvement with counsel, as well as his dependence on others

03:45:22  14   at F-Squared to consult counsel in the everyday performance

03:45:25  15   of their duties.  This is not someone who's a step removed.

03:45:29  16   This is someone who's got his finger on the communication.

03:45:33  17             And this isn't a close case.  It's not a case where

03:45:36  18   he fails to tick one of the elements.  So I think the advice

03:45:42  19   of counsel rule is a good one.  It's been around for a very

03:45:46  20   long time.

03:45:47  21             And these hard cases have eroded it a bit, no

03:45:54  22   question.  If it -- if Mr. Present is allowed to put on this

03:45:59  23   evidence in this case, it really does threaten to swallow the

03:46:02  24   rule.  I mean, what -- what is advice of counsel, if this

03:46:08  25   absence of a record doesn't keep the evidence out?

03:46:12  1          THE COURT:  Okay.  Thank you.

03:46:16  2          30 seconds if you want.

03:46:18  3          MR. FULLER:  Your Honor, I just -- the idea that he

03:46:20  4  didn't know if there was discretion, that's just a red

03:46:22  5  herring.  If you're trading monthly and you have clients with

03:46:26  6  a lot of assets, it's not hard to pick up the phone and say,

03:46:30  7  "Can I do this or that?"  I've heard that before summary

03:46:34  8  judgment.  I just think it's a red herring, and I have to --

03:46:36  9  I wanted to address that.

03:46:37 10          But if I could just urge the Court to read

03:46:43 11  Exhibit 13 of Ms. Hershfang's deposition.  That's where

03:46:46 12  Mr. Present lays out -- excuse me.  Ms. Hershfang's

03:46:51 13  affidavit, not deposition.  She hasn't been deposed.

03:46:54 14          MS. HERSHFANG:  Not yet.

03:46:56 15          MR. FULLER:  So because he discusses -- there's

03:46:58 16  understanding about the high net worth clients and all of

03:47:01 17  that.  But we cited the *Gorski* case not because we think

03:47:05 18  Mr. Present is similar, because Judge Saylor correctly points

03:47:08 19  out there can be a situation where a defendant in good faith

03:47:11 20  goes to a lawyer, and maybe all the information isn't shared.

03:47:14 21  I'm not saying that's what happened here.  But it doesn't

03:47:16 22  preclude him in that case from offering that evidence, or

03:47:19 23  maybe the advice was wrong.  I don't know in this case.  That

03:47:23 24  that's something that we would offer.  I just --

03:47:24 25          THE COURT:  So one thing that you're sort of

03:47:26  1    raising, that only becomes ripe -- it becomes ripe if I allow

03:47:33  2    you to do this.  It may not be ripe now, even if I allow you

03:47:38  3    to go forward, or I deny their motion and allow it to go

03:47:41  4    forward.  It might not now be ripe.  But I bring it up,

03:47:45  5    because you're sort of saying or alluding to it, which is

03:47:48  6    that I get the sense that part of what you want to argue down

03:47:50  7    the road at the end is, "Well, he talked to some lawyers.

03:47:53  8    He" --

03:47:55  9         One thing that it doesn't seem like you have, okay,

03:47:58  10   this isn't necessarily a statement of what the -- I'm not

03:48:06  11   making findings here.  I don't think findings -- I'm not the

03:48:10  12   fact-finder.  But this doesn't seem to be presenting itself

03:48:14  13   like, "I went to the lawyers.  I wrote them a letter," or, "I

03:48:17  14   sat down with them for two hours, and I laid out everything

03:48:21  15   all at once about the evolution of the facts of this," in

03:48:26  16   terms of the backtesting, or the use of live data or whatever

03:48:32  17   you want to call it.  All that he says he knew about the

03:48:35  18   prior use by McDonald, how he learned it, what he knew, what

03:48:40  19   he had, and said, "This is what I want to say, and I'd like

03:48:44  20   you to look at it and come back to me and tell me what I can

03:48:48  21   and cannot say about what I'm doing, given what I've got."

03:48:52  22        You're saying you've got it in different pieces and

03:48:56  23   along the way he's done different things.  But what you seem

03:49:00  24   to want -- in that scenario, if one had laid it out that

03:49:03  25   specifically, in a letter, say, the way a lawyer might, in

03:49:07  1   retrospect you wish he had written a letter to them, laying

03:49:11  2   everything out that he knew and saying to them, "Tell me what

03:49:14  3   I can and can't say and how and so forth," but you would

03:49:18  4   then, it seems to me certainly be fair, if he had written

03:49:21  5   that kind of letter and they had spent five hours for you to

03:49:24  6   have not only the formal advice of counsel and defense, but

03:49:27  7   to probably stand up in front of the jury and say, "Hey, if I

03:49:30  8   was supposed to have trade blotters, they should have told me

03:49:34  9   that.  This was the guru of securities law.  I told them

03:49:37  10  everything I knew.  I laid it all out crystal clear, and I

03:49:40  11  said to him, 'What exactly can I say about the relationship

03:49:42  12  between the signals produced by the index and whatever

03:49:45  13  happened before I signed the contract with whatever that

03:49:50  14  third-party entity is?'"  You could, it seems to me, fairly

03:49:54  15  lay it at the feet of the lawyers, at that point.  I'm just

03:49:57  16  saying that.

03:49:59  17       You don't have quite such a strong evidentiary

03:50:02  18  showing as that.  You don't have to agree or disagree.  I'm

03:50:06  19  just telling you that's my own opinion.  I'm not saying you

03:50:09  20  don't have anything at all.  I'm not commenting.  I'm just

03:50:12  21  saying that you do seem like you want to be able to say,

03:50:15  22  given what he has put in front of the lawyers, you know, if

03:50:19  23  there was more required, that was on them to ask him.

03:50:22  24       And I'm -- am I correct that that's something that

03:50:24  25  you want, at the moment you're thinking that you might want

03:50:26  1    to argue?

03:50:27  2         MR. FULLER:  Your Honor, I certainly believe the

03:50:30  3    record shows that he laid it on the lawyers what he was

03:50:33  4    doing, in one way or another, either over the phone, what he

03:50:37  5    would testify to, or through materials that he gave them, and

03:50:39  6    there's no evidence that anybody said, "Hold off.  Don't do

03:50:42  7    that until" -- the only thing there is is in the mock audit

03:50:46  8    in 2012.  There's a statement in there that says, "You

03:50:50  9    should" --

03:50:50  10        THE COURT:  The SEC's complaining more, though, not

03:50:53  11   about what he was saying, about what he was doing, as much as

03:50:58  12   what he did or didn't say about what he knew.

03:51:00  13        MR. FULLER:  But this goes to the heart of that.

03:51:02  14   Because if it all comes back to:  You didn't look at trade

03:51:06  15   blotters -- in other words, absent trade blotters, you

03:51:09  16   couldn't say anything of these things.  You went and you said

03:51:11  17   it and you didn't have the trade blotters, right?  It's not

03:51:15  18   until that mock audit in 2012, there's a reference that says,

03:51:18  19   "You should have records to support your performance."  This

03:51:20  20   is an index.  So those records, in Mr. Present's mind, are

03:51:24  21   the buy and sell signals and the historical price data that

03:51:27  22   they use to build them out.

03:51:29  23        By the way -- anyway, I don't want to address every

03:51:33  24   argument that Ms. Hershfang made, but -- as tempting as it

03:51:36  25   is.  So there is a sense that he -- he is not informed of

03:51:39 1    that, and then he asks -- and this is where -- so the case --

03:51:42 2    she asked, "Why are we talking about Jay Morton?"  Well, all

03:51:47 3    roads lead to Morton in this case, to be honest.  Yeah, he's

03:51:50 4    not the lawyer, but he's the one who started this thing.  And

03:51:52 5    so after the mock audit and the complaint alleges that he --

03:51:55 6           THE COURT:  Why isn't this case about what your

03:52:00 7    client says he learned from Jay Morton, and to the extent

03:52:03 8    Morton has anything to say about -- whether Jay Morton agrees

03:52:08 9    that that's what your client learns from him or disagrees and

03:52:11 10   says something different?

03:52:13 11          MR. FULLER:  Well, yes.  But it's about -- it's Jay

03:52:15 12   Morton and NFR who were involved -- to give you a preview,

03:52:19 13   Judge, I mean, they made millions of dollars throughout

03:52:24 14   this -- throughout F-Squared's history, sitting back, knowing

03:52:28 15   what Mr. Present was saying about the history, and no one

03:52:30 16   says a word until the summer of 2013.

03:52:33 17          THE COURT:  They made millions of dollars -- what

03:52:36 18   do you mean?  In fees that F-Squared paid to --

03:52:37 19          MR. FULLER:  Paid to them.  Correct.  So it is

03:52:40 20   about them and their incentives and, frankly, treachery to

03:52:44 21   some degree.

03:52:45 22          THE COURT:  You mean, so that goes to why they

03:52:47 23   might not admit that they told all the things that they said

03:52:52 24   that Mr. Present says they said, why they might not admit

03:52:56 25   they said those things.

03:52:58  1          MR. FULLER:  And certainly why they wouldn't when

03:52:59  2     the SEC began their investigation, and why there is only one

03:53:01  3     defendant here, yes.

03:53:03  4          But anyway, we digress to a large degree.

03:53:06  5          THE COURT:  But that's a -- at least here, for

03:53:08  6     these purposes, they're not disputing what your client says

03:53:13  7     Morton said to him.  They're saying --

03:53:15  8          MR. FULLER:  Oh, I think they are.

03:53:17  9          THE COURT:  Well, I think in the larger case, I

03:53:19  10    suppose maybe they are.

03:53:20  11         MR. FULLER:  Yes.

03:53:21  12         THE COURT:  But here, I think in part -- or maybe

03:53:23  13    that's the sort of credibility, but not labeled as

03:53:25  14    credibility, argument Ms. Hershfang's making, but that in the

03:53:30  15    sense of exercise your gatekeeper and don't allow it in,

03:53:35  16    because Morton says I never said -- maybe says, "I never said

03:53:38  17    those things to Present," and Present says he did, so maybe

03:53:41  18    there's no support for it.

03:53:43  19         But I mean, here I think the -- well, the issue is,

03:53:45  20    one, relying on the lawyers in part, what they're complaining

03:53:50  21    about is whether he told them all these -- the extent, or

03:53:53  22    lack thereof, of what he knew about what came before, as

03:53:56  23    opposed to simply saying it's based on live data.  In other

03:53:59  24    words, if you go to your lawyer and say, "It's based on live

03:54:02  25    data," that doesn't necessarily occasion a lawyer to

03:54:08  1    question.

03:54:08  2            MR. FULLER:  Well, might they say, "Well, do you

03:54:11  3    have" -- "what have you done to" -- again, why does the mock

03:54:16  4    audit say, "Do you have books or performance records to

03:54:19  5    support performance?"

03:54:19  6            THE COURT:  Because the terms of engagement for

03:54:22  7    mock audit are probably different than the terms of

03:54:24  8    engagement for -- somebody comes to the lawyer and says,

03:54:26  9    "Here's a press release I want to issue, review it.  It

03:54:29 10    says we have -- one of the things it says is we live data

03:54:30 11    back to 2001, and we've beaten the market every year.  So

03:54:34 12    here's the product," and so forth, and so on.  And the -- and

03:54:39 13    it may be that a lawyer would -- nothing would preclude a

03:54:42 14    lawyer from saying, "What's the basis for saying it's based

03:54:46 15    on live data?"

03:54:47 16            MR. FULLER:  Well, it's interesting you say that,

03:54:49 17    because some of the comments that were made, not on that

03:54:52 18    issue, but what's the basis for this or that.  So they did

03:54:55 19    question some things, but not that.  So I think that's fair

03:54:58 20    game with the lawyers.  Are we going to lay it at the feet of

03:55:01 21    the lawyers at the end of the day?  I don't -- that's not the

03:55:04 22    main defense here.  The main defense is that he acted

03:55:07 23    reasonable, based on all the facts and circumstances at the

03:55:09 24    time; and only in retrospect, when you want to cherry-pick

03:55:12 25    the evidence and package it into a complaint, does he appear

03:55:17  1    that he engaged in the fraud that's alleged.  So it's --

03:55:20  2                THE COURT:  I see.

03:55:20  3                MR. FULLER:  It's a piece of it, Judge.

03:55:22  4                THE COURT:  All right.  Of course, one of the

03:55:28  5    reasons that, like, I imagine that there were fairly

03:55:33  6    substantial terms of engagement over with the mock audit,

03:55:36  7    right, they looked at a lot more in the mock audit than a

03:55:41  8    press release?

03:55:42  9                MR. FULLER:  Yes.  A lot.

03:55:45 10                THE COURT:  Right.

03:55:46 11                MR. FULLER:  And the other -- you know, the

03:55:47 12    other -- if you don't mind me continuing to go on just for

03:55:50 13    one --

03:55:50 14                THE COURT:  Sure.  I enjoy it.

03:55:55 15                MR. FULLER:  If there's nothing else to do right

03:55:57 16    now.

03:55:57 17                The SEC alleges in the complaint that there's a

03:55:59 18    Starbucks meeting, we call it, in July of 2013, and this is

03:56:04 19    where Hoffstein and this guy Tom Rosedale from NFR tell

03:56:10 20    Mr. Present, "We tried to rebuild what you did, and we can't

03:56:14 21    replicate it."  And the complaint alleges he basically told

03:56:17 22    them to drop it, and then it goes on.

03:56:19 23                But after the waiver, we understand he actually

03:56:22 24    went to the lawyers and convened a meeting, and they did --

03:56:26 25    this was -- if this was the sole part of the case, I think

03:56:28   1   there would be advice of counsel defense, because he went

03:56:31   2   back and had a meeting with the lawyers and they actually

03:56:33   3   edit the disclosures to say -- you know, to reflect the fact

03:56:40   4   that he had some -- and he goes to the board and it's out of

03:56:42   5   his hands.  He has in-house counsel at that point.  This is

03:56:45   6   2013.  So I mean, it's just one piece of this that we hadn't

03:56:51   7   discussed.

03:56:52   8           But there's something every year.  2008, it's the

03:56:56   9   one call that we have with Ms. Radford that we can dispute

03:56:56  10   about what it is.  In 2009, it's the Virtus phone call and

03:57:01  11   the work up to that.  In 2010, there's the mock audit.  In

03:57:04  12   2011, there's the marketing review by K&L Gates that I showed

03:57:10  13   you the bills for.  In 2012, there's the other mock audit.

03:57:15  14   And then in '13, we had this other meeting.  So every year,

03:57:18  15   there's some event that we see his good faith.

03:57:21  16           So that's the only thing -- else that I wanted to

03:57:24  17   say.  And I'm happy to leave it at that, unless you have

03:57:24  18   further questions.

03:57:28  19           THE COURT:  No.

03:57:28  20           MS. HERSHFANG:  I don't agree with any of it, and

03:57:30  21   I'm happy to leave it at that.

03:57:32  22           THE COURT:  Fine.  Thank you.

03:57:35  23           MR. FULLER:  Thank you, Your Honor.

03:57:36  24           THE COURT:  All right.  Have a good day.  I

03:57:38  25   appreciate it.

03:57:38  1          Just in terms of scheduling and the timing.  So I'm

03:57:43  2  going to try to resolve this pretty quickly, because I think

03:57:49  3  you should all know in advance.  Essentially what I

03:57:52  4  understand is two things turn on this:  One is the SEC's

03:57:56  5  rebuttal case becomes a lot bigger if this happens, and

03:57:59  6  there's a certain amount of lead time that you need in order

03:58:01  7  to know that you're doing that and you need to know that now.

03:58:06  8          And second, it also turns on the defense case.

03:58:08  9  Because if I say yes, then you're putting in various things

03:58:11  10  that you want to put in.  If I say no, or no in part, or

03:58:14  11  whatever, then it's --

03:58:15  12          So I'm going to try to resolve, however I resolve

03:58:17  13  it, whatever I say, quickly.  I don't anticipate a lengthy --

03:58:22  14  this is going to be like:  This is some contours of what you

03:58:25  15  do or don't get and that's it.  I'm not planning on writing

03:58:28  16  an appellate opinion about the contours of advice of counsel,

03:58:34  17  and I'm trying to figure out what the right answer is and

03:58:39  18  give you instruction in terms of the case.

03:58:41  19          I think in the meantime, since I don't intend to

03:58:44  20  move -- absent some super emergency that hasn't arisen and I

03:58:50  21  don't anticipate, I don't plan to move the trial date.  I

03:58:54  22  don't think either of you are thinking about that, either.

03:58:56  23  So I think what the way that you should operate on this and

03:58:58  24  every other motion in limine, is everything that's possible

03:59:02  25  that's required for rebuttal or evidence is coming in, until

03:59:04  1    there's a ruling that says not.  So in other words, it is

03:59:07  2    better to proceed full steam ahead arranging whatever you

03:59:11  3    want to put in or whatever you want in rebuttal.

03:59:13  4         Now, I'm not saying -- hopefully, it won't take

03:59:16  5    that long to resolve this, but proceed that way, and then to

03:59:20  6    cut back, rather than say, "Well, we were thinking based on

03:59:25  7    one comment you made in court" -- because I truly am thinking

03:59:27  8    a lot about the issues and I think there's a lot of

03:59:30  9    complicated permutations of this that spill over into various

03:59:34 10    parts of the case, and I just want to think that through.

03:59:38 11         So second is, are there likely to be other -- so

03:59:41 12    that's on this.  Are there likely to be other significant

03:59:44 13    motions in limine that either of you anticipate?

03:59:49 14         MS. HERSHFANG:  We don't, Your Honor.

03:59:50 15         MR. FULLER:  We have -- we do have a number of

03:59:52 16    them.  Significant, not in the sense of requiring a quasi

03:59:58 17    summary judgment hearing, but we have probably --

04:00:02 18         How many?

04:00:07 19         MR. O'BRIEN:  Four.

04:00:08 20         MR. FULLER:  Four that we would want to have heard.

04:00:10 21         THE COURT:  And those are -- but are those like

04:00:11 22    pretty discreet?

04:00:12 23         MR. FULLER:  They're discreet, yes.

04:00:12 24         THE COURT:  Like what's an example?

04:00:12 25         MR. FULLER:  One example would be -- an example

04:00:13  1    would be excluding the settlement that the company entered.

04:00:17  2            THE COURT:  I see.

04:00:18  3            MR. FULLER:  Or supposed statements Mr. Present

04:00:21  4    made after the investigation at the advice of -- or the SEC

04:00:25  5    is grinding down on -- you know, we're going to make a motion

04:00:29  6    that he not -- supposed admissions where I think there's a

04:00:33  7    letter that says, you know, where we've taken down --

04:00:36  8            THE COURT:  Which is the "supposed" part?  The

04:00:38  9    statement --

04:00:38 10            MR. FULLER:  Well, it's not his admission.  It's an

04:00:42 11    admission by the company, I suppose, so -- or we would argue

04:00:44 12    that it's 407 remedial measures.  They can't use statements

04:00:49 13    trying --

04:00:49 14            THE COURT:  I see.  So these are more discreet

04:00:52 15    evidence.

04:00:52 16            MR. FULLER:  Very discreet and one about

04:00:53 17    evidence --

04:00:53 18            THE COURT:  So these are the kind of things that we

04:00:56 19    would be briefed -- that we could just address at the

04:00:59 20    pretrial conference.

04:01:01 21            MR. FULLER:  I think so.  We might want to file

04:01:04 22    them earlier.  I think the pretrial order says -- has motions

04:01:08 23    in limine included in it, which wouldn't allow for a

04:01:11 24    response.

04:01:11 25            THE COURT:  Well, I'm anticipating -- I'd have to

04:01:13  1    look back at the schedule.  I don't have it in front of me.

04:01:16  2    But I guess what I would tell you is final pretrial

04:01:20  3    conference I think is on the Thursday before the trial.

04:01:21  4             MS. HERSHFANG:  It's on the 7th.

04:01:23  5             THE COURT:  I would like to have anything that --

04:01:24  6    the best for me would be anything that's -- like a motion in

04:01:28  7    limine that you're going to brief, make sure that the

04:01:30  8    opposition is in by the Friday before Labor Day.  And if one

04:01:33  9    of you thinks that we should address the schedule to account

04:01:37 10    for that, I'm happy to do that.  In other words, what I would

04:01:39 11    like to have happen is if somebody is moving in limine and

04:01:44 12    the other side is going to want to file an opposition, get

04:01:47 13    that briefed by that Friday before the -- Friday of Labor

04:01:52 14    Day.  Friday of -- Labor Day is Monday, the final pretrial is

04:01:56 15    on Thursday of Labor Day week, a couple of days after Labor

04:01:59 16    Day, so I have it for a few days to read over and all the

04:02:03 17    papers.

04:02:03 18             You know, the voir dire, it's fine, you know, on

04:02:08 19    the schedule it is.  But something like that, that's

04:02:12 20    disputed, I'd like to have it then.  Because that's the -- I

04:02:16 21    mean, I don't imagine a big dispute about the questions to

04:02:19 22    ask at jury selection in a case like this.

04:02:21 23             MR. FULLER:  I don't, either.

04:02:23 24             THE COURT:  And it's really -- but the motion in

04:02:27 25    limine, I'll tell you the preliminary instructions, the

04:02:29  1      preliminary instructions I ordinarily give are, say, the --

04:02:33  2      the only thing they say about the case is like a paragraph

04:02:35  3      that says -- summarizing, "This is what the SEC claims, and

04:02:38  4      there's count, 1, 2, 3, 4, 5."  It's pretty plain vanilla.

04:02:43  5      And you deny it.  Or if you want more than, "You deny it,"

04:02:46  6      but there's a paragraph, that will do.  If you guys want to

04:02:48  7      write it, that's fine with me.  But then I'll write it.

04:02:53  8      Usually I end up writing it, because nobody does it, but

04:02:56  9      there isn't a lot to sort of fight about that.

04:02:59 10           The bigger fight comes in the final instructions,

04:03:01 11      which you might be submitting before if we have time.

04:03:04 12           So the motions in limine seem like the one thing

04:03:07 13      that would be worth making sure that those are briefed by

04:03:10 14      them.

04:03:10 15           MS. HERSHFANG:  So Your Honor, I just pulled out a

04:03:12 16      calendar, so I make sure I have my head where you want it.

04:03:16 17      So if I understand the Court correctly, you're saying --

04:03:19 18      Labor Day this year is the 4th, and the Friday before it is

04:03:22 19      September 1st.  So is Your Honor saying oppositions need to

04:03:26 20      be filed on the 1st?

04:03:27 21           THE COURT:  If you could file the oppositions on

04:03:29 22      the 1st to motions in limine.

04:03:30 23           MS. HERSHFANG:  Which would make the motions due

04:03:32 24      the prior Friday, which is the 25th, given the local rule

04:03:36 25      seven-day opposition.

04:03:36  1              MR. FULLER:  That's fine.

04:03:37  2              THE COURT:  And if that's fine with you both,

04:03:39  3  that's fine.

04:03:40  4              MS. HERSHFANG:  That's fine.

04:03:40  5              THE COURT:  I don't have a problem if, like, you

04:03:43  6  can talk to each other and if you have different -- all I --

04:03:45  7  the date I care about is when it's ripe.

04:03:48  8              MS. HERSHFANG:  Okay.

04:03:48  9              THE COURT:  So -- on those.  And that will give me

04:03:50 10  a sufficient time to read them and come into the conference

04:03:53 11  to have thought about them and be ready to talk about them

04:03:56 12  and whatever.

04:03:57 13            MS. HERSHFANG:  And we'll have some, too.  I didn't

04:04:00 14  want to say we didn't have any, we just don't have any more

04:04:02 15  humdingers.

04:04:03 16            THE COURT:  All right.  I understand.  Thank you.

04:04:05 17  I appreciate it.

04:04:05 18            THE DEPUTY CLERK:  All rise.  This matter is

04:04:06 19  adjourned.

20              (Court in recess at 4:04 p.m.)

21

22

23

24

25

1
**CERTIFICATE OF OFFICIAL REPORTER**

2

3

4          I, Rachel M. Lopez, Certified Realtime Reporter, in

5    and for the United States District Court for the District of

6    Massachusetts, do hereby certify that pursuant to Section

7    753, Title 28, United States Code, the foregoing pages

8    are a true and correct transcript of the stenographically

9    reported proceedings held in the above-entitled matter and

10   that the transcript page format is in conformance with the

11   regulations of the Judicial Conference of the United States.

12

13                    Dated this 7th day of August, 2017.

14

15

16

17          /s/ RACHEL M. LOPEZ

18

19

20          _____
            Rachel M. Lopez, CRR

21          Official Court Reporter

22

23

24

25