UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

)
SECURITIES AND EXCHANGE COMMISSION, )
)
        Plaintiff, )
)
v. )   Case No. 14-cv-14692-LTS
)
HOWARD B. PRESENT, )
)
        Defendant. )
)

ORDER ON MOTION FOR ENTRY OF FINAL JUDGMENT (DOC. NO. 357)

March 20, 2018

SOROKIN, D.J.

    The Securities and Exchange Commission ("SEC") brought a civil enforcement action against Defendant Howard Present for violations of the Investment Advisers Act of 1940 (the "Advisers Act") and rules thereunder. Following a trial, the jury returned a verdict on October 5, 2017 in favor of the SEC. Doc. No. 353. Pending before the Court is the SEC's motion for entry of final judgment. Doc. No. 357. The SEC's motion is ALLOWED. For the reasons that follow, the Court enjoins Present from future violations of the Advisers Act and orders Present to pay (i) disgorgement in the amount of $10,849,604, (ii) pre-judgment interest on the disgorgement amount, and (iii) a civil penalty in the amount of $1,575,000.

I.    INJUNCTIVE RELIEF

    The SEC urges the Court to enjoin Present permanently from violating the Advisers Act provisions and related rules at issue in this action. Section 209(d) of the Advisers Act provides that, upon a showing that a person has engaged in an act or practice that violates the Act, a

1

permanent injunction "shall be granted without bond." 15 U.S.C. § 80b-9(d). Injunctive relief is appropriate where there is a "reasonable likelihood of recidivism[.]" SEC v. Sargent, 329 F.3d 34, 39 (1st Cir. 2003). In determining whether future violations are reasonably likely, courts consider, among other factors, the nature of the violation (including its "egregiousness and its isolated or repeated nature"), whether the defendant will be in a position to violate the law again, and whether the defendant has recognized the wrongfulness of his conduct. Id.

These factors weigh in favor of injunctive relief. Based on the evidence presented at trial, the Court finds that Present's conduct was egregious. While AlphaSector was not a sham product (a fact weighing against injunctive relief), Present secured AlphaSector's success through false statements over a substantial period of time. Far from isolated instances, Present's misstatements were consistent in message, broadly disseminated, and increasingly bold. Moreover, the false statements multiplied due to Present's persistent disinterest in whether what he was advertising was truthful. The jury found that Present acted with scienter in the form of recklessness, defined as "an extreme departure from the standards of ordinary care, which presents a danger of misleading other persons that is either known to the defendant or is so obvious that the defendant must have been aware of it." Present's recklessness lasted for most of the sales life of the AlphaSector strategy. It persisted in the face of pointed inquiry from investment professionals, among others. It arose despite his extensive familiarity with due diligence. Yet, only after Corey Hoffstein and Tom Rosedale raised the specter of legal action in July 2013 did Present inquire into whether the advertised pre-2008 returns were accurate and whether real client assets had in fact followed the strategy before AlphaSector's inception. Doc. No. 363 ¶ 10.

Even now, Present declines to take responsibility for years of misleading clients and potential clients. He fails to understand the wrongfulness of having misrepresented the strategy. See, e.g., Present Affidavit, Doc. No. 363 ¶ 14 ("based on the live performance of the [AlphaSector] Indexes, this was a 'victimless' violation"). Further, he blames his violations on Jay Morton. Id. ¶ 16 ("it was an isolated event, triggered by a third-party's fraud, and there were never any clients harmed"); id. ¶ 5 (characterizing his violations as "not engaging in enough due diligence to have discovered the truth of the matter"); id. ("my false statements were the direct result of fraudulent statements made to me verbally, in writing, and through contractual language from Jay Morton and his colleagues at NFR"). Nonetheless, Present bears independent, personal responsibility for his own independent conduct. Among other things, he recklessly made repeated false statements that lured cautious investors to trust their savings to an untested product that he represented as battle-hardened through two bear markets. His failure to recognize the harm of his misrepresentations, his sustained willingness to make ever-bolder statements without any support, and his inability to appreciate his own role in misleading investors now all indicate a reasonable likelihood of further violations.[1] A permanent injunction is therefore appropriate.[2]

II.  DISGORGEMENT

The SEC seeks disgorgement by Present of $11,524,614, representing Present's earnings from F-Squared after 2009,[3] reduced by (i) an annual amount equal to Present's pre-AlphaSector compensation (approximately $115,000 a year) and (ii) a "percentage arguably attributable to

---

[1] Although Present notes that he has not worked in the securities industry since 2014, Present Aff., Doc. No. 363 ¶ 17, the Court finds it reasonably likely that Present will seek to resume what he characterizes as his "long, unblemished career … in the securities area[,]" id. ¶ 3.
[2] In no way does the Court view an injunction as punishment for Present's proceeding to trial.
[3] 28 U.S.C. § 2462 bars disgorgement of payments received more than five years before the SEC's filing of its enforcement case (here, December 22, 2014). See Kokesh v. SEC, 137 S.Ct. 1635 (2017).

3

continued sales of AlphaCycle," assuming that the AlphaCycle product would have sustained F-Squared absent the intervening success of AlphaSector.  Doc. No. 358 at 11.

As an initial matter, Present contends that disgorgement is a penalty outside of the Court's equitable authority to order, in light of the Supreme Court's holding in Kokesh that disgorgement is a penalty for purposes of Section 2462.  However, Kokesh's holding on the scope of Section 2462 does not undermine First Circuit precedent supporting a court's equitable power to prevent unjust enrichment by ordering disgorgement.  See SEC v. Sargent, 329 F.3d 34, 41 (1st Cir. 2003) (distinguishing statutory civil penalties, which "are intended to penalize the defendant for illegal conduct," from equitable disgorgement, which "merely restores a defendant to his original position without extracting a real penalty for his illegal behavior" (internal citations omitted)).  Moreover, no court has understood Kokesh to call such authority into question.  See, e.g., SEC v. Metter, 706 Fed.Appx. 699, 702 (2d Cir. 2017) (addressing Kokesh and upholding disgorgement order); SEC v. Jammin Java Corp., 2017 WL 4286180 at *2-4 (declining "to upset decades of settled jurisprudence" supporting courts' equitable power to order disgorgement).  This Court likewise concludes that its equitable power to order disgorgement remains intact.

The Court has discretion to enter an order of disgorgement in an amount reflecting "a reasonable approximation of the profits causally connected to" Present's violations.  SEC v. Happ, 392 F.3d 12, 31 (1st Cir. 2004) (quoting SEC v. First City Fin. Corp., 890 F.2d 1215, 1231 (D.C. Cir. 1989)).  Disgorgement forces the defendant to give up the amount by which he was unjustly enriched, "even if it exceeds actual damages to victims."  SEC v. Cavanagh, 445 F.3d 105, 117 (2d Cir. 2006) (internal citation omitted).  "The risk of uncertainty in calculating disgorgement should fall on the wrongdoer whose illegal conduct created that uncertainty."

4

Happ, 392 F.3d at 31 (internal citations omitted). "Once the SEC shows that the disgorgement is a reasonable approximation, the burden shifts to the defendant to demonstrate that the amount of disgorgement is not a reasonable approximation." Id. (internal citations omitted).

Having considered the parties' briefs and heard argument at a hearing on the SEC's motion, the Court concludes that the SEC's proposed disgorgement amount is a "reasonable approximation of profits causally connected to" Present's violations. Id. For purposes of its analysis, the Court considers separately (a) proceeds from AlphaSector from before September 2013, during which time F-Squared promoted AlphaSector using the misstatements and erroneous performance history, and (b) proceeds from AlphaSector since September 2013, when F-Squared removed the misrepresentations from marketing materials.

*Pre-September 2013 Proceeds*

At trial, the SEC presented ample evidence of the marketing significance of Present's claims about the strategy's pre-2008 track record. Present specifically touted the strategy's supposed response to market downturns in August 2001 and October 2007. These assurances about AlphaSector's "airbag" were particularly salient for F-Squared's clients, especially given the post-meltdown era in which the statements were made. Present marketed the strategy as shock-tested live during previous downturns. Present points out that almost all of the revenue that F-Squared generated from AlphaSector arose after the index's first full year in use. However, all of the proceeds during this period are causally connected to his misstatements. For instance, between October 2009 and September 2010, in its second full year in use, AlphaSector raised the vast majority of its new assets from clients that already had invested in AlphaSector before that period. Those assets are traceable to the misrepresentations that initially inspired confidence in the strategy. Further, later clients sought confirmation from Present that the

5

advertised pre-2008 performance was genuine.  Thus, Present fails to demonstrate any "clear break in or considerable attenuation of the causal connection between" his misstatements and any of the assets raised prior to September 2013.  Happ, 392 F.3d at 32.  Accordingly, the Court orders Present to disgorge all compensation that he earned in relation to AlphaSector before that time.

    *Post-September 2013 Proceeds*

The SEC opened its investigation of F-Squared and Present in September 2013. Subsequently, F-Squared removed all pre-2008 performance history from its AlphaSector marketing materials.  The parties dispute whether the steps that Present took effected full disclosure to existing clients.[4]  Doc. No. 363 ¶ 37; Doc. No. 365 at 4.  Present sent a letter dated October 10, 2013 letter to F-Squared's clients sharing updated marketing materials and asking clients to disregard all previous material going forward.  Doc. No. 365-3.  The letter announced that "the SEC staff has been conducting an *examination* of F-Squared."  Id. (emphasis added).  In no place did the letter reference the Division of Enforcement, an investigation, or any potential enforcement proceedings.  While Present's letter noted that the SEC's "questions relate to advertising, and the focus appears to be on the use of historic data in advertising materials and clarity around our role as an index manager[,]" id., the letter failed to recant prior statements representing that actual clients had tracked the AlphaSector strategy before 2008 and providing overstated returns for the index.  The letter further obscured the disclosure by noting that the new materials reflected "an already planned change that will present the Index performance record for the most recent five years of performance."  Id.  The bulk of the letter sought to assure clients that the AlphaSector strategy remained an appealing investment.  The Court does not consider

---

[4] Besides a *Wall Street Journal* article that referenced the investigation, which Present cites, Doc. No. 363 ¶ 37, the parties' memoranda discuss no remedial disclosures that Present or F-Squared made to the investing public.

such an obscuring and incomplete disclosure to have broken any causal link between prior misrepresentations and post-2013 investments.

While F-Squared's retiring of the backtested performance data in September 2013 raises some doubt that all asset inflows from clients not previously invested with AlphaSector[5] stemmed from Present's violations, the Court recognizes that factors beyond the then-current disclosures were material in these investment decisions. These factors included the residual influence of Present's prior misrepresentations and the significant client assets and market hype that those representations had secured for F-Squared. For these reasons, and given that "[t]he risk of uncertainty in calculating disgorgement should fall on the wrongdoer whose illegal conduct created that uncertainty," Happ, 392 F.3d at 31, the Court finds it reasonable to include all of Present's post-September 2013 earnings in the approximation of profits causally connected to Present's violations.

*Adjustment to SEC's Requested Disgorgement*

The Court makes one adjustment to the SEC's calculation of the disgorgement amount. With respect to his base salary, Present states that F-Squared's board of directors approved base compensation of $250,000 per annum and that the $115,000 figure represents a partial-year payment. Doc. No. 363 ¶ 24. The SEC does not explain why disgorgement should be reduced by that partial-year payment rather than by the yearly salary of $250,000 that Present had been authorized to receive. Doc. No. 365 at 4. The Court considers an adjustment based on the authorized annual figure over five years to be appropriate.[6]

---

[5] Sales data submitted by Present indicates that only a small portion of F-Squared clients made initial investments with the AlphaSector index after September 2013. Doc. No. 363-3.
[6] F-Squared also offered other AlphaSector-titled index products "that were not solely based on the AlphaSector U.S. equity product." See Doc. No. 358 at 12-13; Doc. No. 358-1 ¶ 9b. Proceeds from the sale of these products is included in the disgorgement amount, since Present's misrepresentations about AlphaSector taint products for which AlphaSector was a key component.

7

Thus, disgorgement is ordered in the amount of $10,849,604.[7]

III. PREJUDGMENT INTEREST

The SEC also asks the Court to award prejudgment interest on the disgorgement amount. Like disgorgement, prejudgment interest "is intended to deprive wrongdoers of profits they illegally obtained by violating the securities laws"—specifically, any "interest-free loan" on the unjust enrichment. Sargent, 329 F.3d at 40-41. The Court has "broad discretion" to determine whether to award prejudgment interest. Id. at 41.

Present enjoyed the use of proceeds from his violations since 2009. The Court therefore orders payment of prejudgment interest on the disgorgement amount, calculated at the rate used by the Internal Revenue Service to calculate underpayment penalties. See SEC v. Druffner, 802 F.Supp.2d 293, 298 (D. Mass. 2011). The Court directs the SEC to submit a revised prejudgment interest amount for the relevant time period using as principal the amount of disgorgement determined by the Court herein.

IV. CIVIL PENALTY

Finally, the SEC requests that the Court order Present to pay "an appropriate third-tier civil penalty," Doc. No. 358 at 17, as authorized under Section 209(e) of the Advisers Act, 15 U.S.C. § 80b-9(e). Section 209(e) establishes three tiers of civil penalties. A third-tier penalty is warranted if "the violation involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and if the defendant's conduct "directly or indirectly

---

[7] This amount reflects Present's post-2009 earnings ($12,102,748), minus a *pro rata* amount of earnings attributable to sales of the AlphaCycle product (totaling $3,144) and Present's authorized, annual salary ($1,250,000 over five years).

8

resulted in substantial losses or created a significant risk of substantial loss to other persons." 15 U.S.C. § 80b-9(e)(2)(C). In determining an appropriate civil penalty, courts have considered factors including the egregiousness of the violation, the defendant's willingness or failure to admit wrongdoing, the isolated or repeated nature of the violations, the degree of scienter involved, and the defendant's current financial condition. SEC v. Esposito, 260 F.Supp.3d 79, 93 (D. Mass. 2017).

Here, the facts show that Present's misrepresentations exposed clients to "a significant risk of substantial losses." In the wake of a major financial crisis, F-Squared targeted investors who were seeking to avoid losses during periods of severe market decline. Present claimed to these investors that AlphaSector had avoided losses for real clients in prior economic downturns. AlphaSector in fact had not been tested in these conditions. Present now trumpets AlphaSector's loss avoidance at the outset of the financial crisis; however, at that time, the AlphaSector index was already 50% invested in cash. Doc. No. 365-5. The post-crash real performance of AlphaSector fits the story of the market's steady recovery since 2009 and does not erase any risk of substantial loss that Present created by inducing an especially risk-averse segment of investors into following an actually-untested strategy. Additionally, as noted, Present was reckless, his conduct was repeated, and he has never meaningfully acknowledged or appreciated his own misconduct.

These factors warrant a third-tier civil penalty under 15 U.S.C. § 80b-9(e)(2). The Court determines that the number of misrepresentations that Present made is the appropriate measure of his violations. This is so because the gravamen of his offense was the repeated and increasingly bolder misrepresentations that he made. In evaluating Present's misconduct here, the Court finds that it does not merit a per-violation penalty near the statutory maximum (i.e., $150,000 or

$160,000) established by Congress, largely because the AlphaSector product itself was not fraudulent. However, the Court considers Present's conduct sufficiently egregious to warrant a per-violation penalty well above the lower range available (e.g., $0 to $25,000).

Present asserts that he is effectively insolvent. Doc. No. 18. Assuming and accepting, without deciding, that he is presently insolvent, the Court finds that Present retains substantial earning capacity, in large part because of his experience in the financial industry. Accordingly, the Court finds further information regarding Present's current financial status unnecessary.

Considering the totality of the facts and circumstances, the nature of Present's conduct, his assumed insolvency, and his present earnings potential, the Court finds that a civil penalty of $75,000 is warranted for each of the 21 violations identified in the SEC's memorandum in support of its motion, Doc. No. 358 at 16-17, for a total civil penalty of $1,575,000.

IV.  FINAL JUDGMENT

Pursuant to the jury's verdict (Doc. No. 353), and having considered the SEC's Motion for Entry of Final Judgment (Doc. No. 357), the Court ALLOWS the SEC's Motion as described herein. The SEC shall submit, by close of business on March 26, 2018, a conforming order of final judgment for the record.

SO ORDERED.

　/s/ Leo T. Sorokin　　　
Leo T. Sorokin
United States District Judge